20-11188-HH

IN THE

# United States Court of Appeals

**FOR THE ELEVENTH CIRCUIT**

ROBERT DEXTER WEIR, DAVID RODERICK WILLIAMS,

AND LUTHER FIAN PATTERSON,

*Petitioners-Appellants*,

- v. -

UNITED STATES OF AMERICA,

*Respondent-Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-CV-23420-UU

## PETITION FOR PANEL REHEARING OR REHEARING *EN BANC*


STEVEN M. WATT
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7870

DANIEL B. TILLEY
ACLU FOUNDATION OF FLORIDA
4343 W. Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714

PATRICK N. PETROCELLI
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

JONATHAN HAFETZ
1109 Raymond Boulevard
Newark, NJ 07102
(917) 355-6896

*Attorneys for Petitioners-Appellants Robert Dexter Weir, David Roderick Williams, and Luther Fian Patterson*

**STATEMENT OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Petitioners-Appellants do not have a parent corporation and are not publicly held corporations.

Interested parties are as follows:

American Civil Liberties Union, Inc.

American Civil Liberties Union of Florida, Inc.

American Civil Liberties Union Foundation, Inc.

American Civil Liberties Union Foundation of Florida, Inc.

Cohen, Eric Martin

Colan, Jonathan D.

Cronin, Sean Paul

Emery, Robert

Fajardo Orshan, Ariana

Ferguson, Patrick W.

Garber, Hon. Barry L.

Goodman, Hon. Jonathan

Greenberg, Benjamin G.

Hafetz, Jonathan

Loewy, Ira N.

Malone, Todd Omar

Matzkin, Daniel

Mendez , Jr., Joaquin

O'Sullivan, Hon. John J.

Patterson, Luther Fian

Petrocelli, Patrick N.

Quencer, Kevin

Simonton, Hon. Andrea M.

Smachetti, Emily M.

**Stroock & Stroock & Lavan LLP**

Tarre, Michael S.

Thompson, George Garee

Tilley, Daniel B.

Torres, Hon. Edwin G.

Ungaro, Hon. Ursula

United States of America

Watt, Steven M.

Weir, Robert Dexter

White, Hon. Patrick A.

Williams, David Roderick

## STATEMENTS OF COUNSEL REQUIRED BY 11TH CIR. R. 35-5

I express a belief, based on a reasoned and studied professional judgment, that the Panel decision is contrary to the following decision(s) of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court: *United States v. Tomeny*, 144 F.3d 749, 751 (11th Cir. 1998); *United States v. Peter*, 310 F.3d 709, 713 (11th Cir. 2002); *United States v. Saac*, 632 F.3d 1203, 1208 (11th Cir. 2011).

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance:

1. Whether the Felonies Clause in Article I, Section 8, of the U.S. Constitution only authorizes Congress to define and punish felonies that have a U.S. nexus.

2. Whether a Due Process Clause challenge to the Government's power to prosecute foreign nationals is jurisdictional when it is based on the record before the district court when it entered the convictions.

/s/ Patrick N. Petrocelli

ATTORNEY OF RECORD FOR PETITIONERS-APPELLANTS ROBERT DEXTER WEIR, DAVID RODERICK WILLIAMS, AND LUTHER FIAN PATTERSON

## TABLE OF CONTENTS

Page

STATEMENT OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........ C-1

STATEMENTS OF COUNSEL REQUIRED BY 11TH CIR. R. 35-5 ........ i

TABLE OF AUTHORITIES ........ iv

STATEMENT OF ISSUES ........ 1

INTRODUCTION ........ 1

STATEMENT OF PROCEEDINGS ........ 3

I. Petitioners plead guilty to felonies with no U.S. nexus. ........ 3

II. Petitioners seek to vacate their convictions. ........ 4

III. The Panel affirms the District Court's ruling on Petitioners' Felonies Clause claim and *sua sponte* reverses the District Court's ruling that it had jurisdiction to consider Petitioners' Due Process Clause claim. ........ 5

ARGUMENT AND AUTHORITIES ........ 6

I. The Court should adopt the original understanding of the Felonies Clause and hold that the power is limited by a nexus requirement. ........ 6

A. The original understanding of the Felonies Clause confirms that Congress's authority is limited by a nexus requirement. ........ 7

B. Founding-era practices confirm that Congress's authority under the Felonies Clause is limited by a nexus requirement. ........ 9

C. This Court's interpretation of the Felonies Clause should be reconsidered because it renders the Piracies Clause meaningless ........ 11

D. Section 2237(a)(2)(B) exceeds Congress's authority under the Felonies Clause by criminalizing conduct without a U.S. nexus. ........ 15

II. The District Court had jurisdiction to consider Petitioners' Due Process Clause claim. ........ 16

CONCLUSION ........................................................ 18

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(**A**) ........................................................ 19

CERTIFICATE OF SERVICE ........................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


* *Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ........................................11

*Mistretta v. United States*,
488 U.S. 361 (1989)........................................9, 10

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)........................................9, 11

*Talbot v. Jansen*,
3 U.S. (3 Dall.) 133 (1795) ........................................12

* *United States v. Bellaizac-Hurtado*,
700 F.3d 1245 (11th Cir. 2012) ........................................12, 13

*United States v. Davis*,
905 F.2d 245 (9th Cir. 1990) ........................................7

* *United States v. Dire*,
680 F.3d 446 (4th Cir. 2012) ........................................13

*United States v. Estupinan*,
453 F.3d 1336 (11th Cir. 2006) ........................................6

* *United States v. Furlong*,
18 U.S. (5 Wheat.) 184 (1820) ........................................12, 13

*U.S. v. Palmer*,
16 U.S. (3 Wheat.) 610 (1818) ........................................12, 14

* *United States v. Peter*,
310 F.3d 709 (11th Cir. 2002) ........................................16, 17

* *United States v. Saac*,
632 F.3d 1203 (11th Cir. 2011) ........................................6, 14, 16

*United States v. Skinner*,
25 F.3d 1314 (6th Cir. 1994) ........................................17

*United States v. Smith*,
18 U.S. (5 Wheat.) 153 (1820) ....................................................................12

* *United States v. Tomeny*,
144 F.3d 749 (11th Cir. 1998) ....................................................................16

*United States v. Van Der End*,
943 F.3d 98 (2d Cir. 2019) ..........................................................................17

**Statutes**

18 U.S.C. § 2237 ..........................................................................3, 4, 5, 15

**Other Authorities**

* 6 Annals of Congress 598 (1800) ....................................................................11

* 2 Farrand, The Records of the Federal Convention of 1787 ............................7, 8, 9

* Letter from Thomas Jefferson to Edmond Charles Genet (June 17,
1793) ..........................................................................................................10

* Madison, Special Message to Congress on the Foreign Policy Crisis –
War Message (June 1, 1812)....................................................................9, 10

* The Federalist No. 42 (Madison) ......................................................................8

Wheaton's Elements of International Law § 124 (8th ed. 1866)..............................7

## STATEMENT OF ISSUES

1. Whether the Felonies Clause in Article I, Section 8, of the U.S. Constitution only authorizes Congress to define and punish felonies that have a U.S. nexus.

2. Whether a Due Process Clause challenge to the Government's power to prosecute foreign nationals is jurisdictional when it is based on the record before the district court when it entered the convictions.

## INTRODUCTION

Under this Court's precedent, Congress has unlimited jurisdiction over felonies committed on the high seas. It can criminalize conduct by foreign nationals even when they are aboard foreign-flagged vessels, are not traveling to or from the United States, and otherwise lack any U.S. nexus. This case demonstrates the breadth of Congress's purported authority. Petitioners have no U.S. connections. They are Jamaican nationals. When the Coast Guard forcibly stopped their Jamaican-flagged vessel on the high seas, Petitioners were traveling from Jamaica towards Haiti. Their crime—making a false statement about their vessel's destination during a boarding—has nothing to do with the United States. Yet, bound by precedent, the Panel upheld Petitioners' convictions. That precedent should be overruled, and Petitioners' convictions should be vacated.

This Court's interpretation of Congress's power to define and punish felonies on the high seas is incorrect. When Congress acts under this authority, it is constrained by a nexus requirement. This interpretation is supported by the Framers' original understanding of the felonies power, founding-era practices, and the need to ensure that Congress's separate power to define and punish piracies on the high seas is not rendered meaningless. When this Court declined to limit Congress's authority, it did not give these factors sufficient consideration. Granting *en banc* review is necessary to place meaningful limits on Congress.

Separately, Petitioners' convictions violate the Due Process Clause. The Panel did not hold otherwise. Instead, it *sua sponte* found a lack of jurisdiction to even consider Petitioners' claim. The Panel was mistaken. Under binding precedent, the District Court had jurisdiction because the claim is based on the record before the District Court when it accepted Petitioners' pleas. Panel rehearing or rehearing *en banc* is appropriate to protect the rights of individuals to raise nonwaivable constitutional challenges to their convictions.

## STATEMENT OF PROCEEDINGS

### I. Petitioners plead guilty to felonies with no U.S. nexus.

Petitioners are Jamaica citizens. (Doc. 4-1 [A-37].[1]) While aboard a Jamaican-flagged vessel on the high seas, U.S. Coast Guard officers observed them traveling from Jamaica towards Haiti. (Doc. 4-4 [A-61].) The officers forcibly stopped Petitioners' vessel at gunpoint while the vessel was in international waters and, as they boarded it, confirmed that Petitioners' vessel was registered in Jamaica. (*Id.*) The officers asked Petitioners where they were going and, according to Petitioners' factual proffers, Petitioners each "told the United States Coast Guard boarding officers that the vessel's destination was the waters near the coast of Jamaica, where they intended to fish," even though they "then and there well knew, the vessel's true destination was Haiti." (Doc. 4-4 [A-61-62].)

After the boarding, the officers destroyed the men's fishing boat, took Petitioners into custody, and held them at sea for thirty-plus days before bringing them to Miami. (Doc. 4-4 (A-61); Doc. 4-1 [A-37].) The Government eventually charged Petitioners with violating 18 U.S.C. § 2237(a)(2)(B). (Doc. 4-2 [A-40-41].) That statute makes it a crime "for any person on board . . . a vessel subject to the jurisdiction of the United States, to . . . provide materially false information to a

---

[1] "Doc." citations refer to docket entries from 19-cv-23420-UU. "A-__" citations refer to the Appendix of Petitioners-Appellants, filed in this Court on May 5, 2020.

Federal law enforcement officer during a boarding of a vessel regarding the vessel's destination." Petitioners each pled guilty to an Information pursuant to identical factual proffers and plea agreements. (Doc. 4-3 to 4-10 [A-53-100].)

## II. Petitioners seek to vacate their convictions.

After serving their sentences, Petitioners moved to vacate their convictions by filing a petition for issuance of writs of error coram nobis. (Doc. 1 [A-5-28].) They argued that their convictions violated the Felonies and Due Process Clauses of the Constitution. Petitioners showed how their convictions violated the Felonies Clause because Congress exceeded its authority under that clause by criminalizing conduct of foreign nationals on the high seas even though Petitioners were, at the time, aboard a foreign-flagged vessel in international waters and their conduct (providing a false statement about their intended destination) lacked a U.S. nexus. And they demonstrated that the Due Process Clause prohibited their prosecutions because Congress cannot criminalize the extraterritorial conduct of foreign nationals unless the proscribed conduct is contrary to the laws of all reasonably developed legal systems. (*Id.* [A-21-26].) Petitioners also demonstrated that their claims were jurisdictional and not subject to procedural default. (*Id.* [A-13].)

The Government opposed the petition on jurisdictional and substantive grounds. (Doc. 15 [A-137-155].) On jurisdiction, the District Court ruled in Petitioners' favor, holding that "Petitioners' constitutional challenges to

§ 2237(a)(2)(B) are jurisdictional and not waivable." (Doc. 17 at 6 [A-179]. But, on the merits, the District Court ruled against Petitioners. The District Court did not address Petitioners' argument under the Felonies Clause because, as Petitioners acknowledged, the argument was foreclosed by binding precedent. (*Id.* at 10-19 [A183-192].) The District Court also determined that Petitioners' prosecutions satisfied due process. (*Id.* at 19-21 [A-192-194].)

## III. The Panel affirms the District Court's ruling on Petitioners' Felonies Clause claim and *sua sponte* reverses the District Court's ruling that it had jurisdiction to consider Petitioners' Due Process Clause claim.

On appeal, the Government did not challenge the District Court's holding that it had jurisdiction to consider Petitioners' claims. (Br. for the U.S. at 9-54 (June 30, 2020).) Nevertheless, although the Panel agreed that the District Court had jurisdiction over Petitioners' Felonies Clause claim, it *sua sponte* reversed the District Court's holding that it also had jurisdiction over Petitioners' Due Process Clause claim. Op. at 6-8 & n.2. Accordingly, the Panel did not address due process on the merits, but rather vacated that portion of the District Court's decision. *Id.* at 6-7. And, relying on this Court's precedent, the Panel rejected Petitioners' Felonies Clause claim. *Id.* at 8-9.[2]

[2] Petitioners raised a separate Felonies Clause claim, which the Panel rejected. Op. at 9-18. Petitioners do not seek rehearing of that aspect of the Panel's decision.

## ARGUMENT AND AUTHORITIES

### I. The Court should adopt the original understanding of the Felonies Clause and hold that the power is limited by a nexus requirement.

Article 1, Section 8, of the Constitution authorizes Congress "[t]o define and punish Piracies and Felonies committed on the high Seas." This provision contains two separate-and-distinct grants of power: the power to define and punish Piracies committed on the high seas ("Piracies Clause") and the power to define and punish Felonies committed on the high seas ("Felonies Clause").

Congress's Felonies Clause authority is limited by a U.S. nexus requirement. This interpretation is supported by the original understanding of Congress's constitutional authority, is confirmed by founding-era practices reflecting the limits of the Clause's reach, and ensures that the Piracies Clause is not rendered meaningless. This Court, however, has not imposed a nexus requirement on the Felonies Clause, reasoning that "the clause does not expressly limit Congress's power to only those offenses committed on or by United States citizens." *United States v. Saac*, 632 F.3d 1203, 1209 (11th Cir. 2011); *United States v. Estupinan*, 453 F.3d 1336, 1338 (11th Cir. 2006). Instead, under *Saac* and *Estupinan*, Congress has been granted unlimited jurisdiction to criminalize any conduct by foreign nationals aboard foreign-flagged vessels on the high seas. Those decisions were wrongly decided. *En banc* review is appropriate to overrule them and to

impose proper limits on Congress's authority to criminalize conduct by foreign nationals aboard foreign-flagged vessels on the high seas.[3]

### A. The original understanding of the Felonies Clause confirms that Congress's authority is limited by a nexus requirement.

Although the Felonies Clause is silent on whether Congress's power is limited by a nexus requirement, this Court erred by construing that silence as acquiescence. The Framers did not need to include an express nexus requirement because they understood that the requirement was an inherent limitation imposed on all nations. The Felonies Clause thus reflects the universally recognized principle that one nation's criminal laws "can only be tried by that State . . . on board of whose vessels . . . the offence thus created was committed." Wheaton's Elements of International Law § 124 (8th ed. 1866). The Framers considered two alternatives to vesting the define-power in Congress: (1) adopting England's definition of felonies; and (2) allowing the States to define felonies. 2 Farrand, The Records of the Federal Convention of 1787, at 316. The consideration and rejection of these alternatives shows that Congress is only authorized to act under the Felonies Clause when there is a U.S. nexus.

[3] This Court's precedent is also in tension with the Ninth Circuit's holding that the Felonies Clause power is restricted to cases where there is "a sufficient nexus between the defendant and the United States." *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990) (relying on the Due Process Clause as the source of limitation).

The Framers' consideration of whether to rely on England's definition of felonies is particularly illustrative of the limited scope of the Felonies Clause. The Framers understood it would be "dishonorable and illegitimate" for England's definition of felonies to apply to U.S. citizens unless those definitions were "previously made [the United States'] own by legislative adoption." The Federalist No. 42 (Madison). Accordingly, they rejected the idea that felonies defined by England should apply of their own force in the United States. *Id.* Imbedded in this decision is the belief that "no foreign law should be a standard farther than is expressly adopted"—*i.e.*, the laws of England should not apply to U.S. citizens. Farrand, *supra* at 316 (statement of James Madison). The reverse is also true. It is equally dishonorable and illegitimate for Congress to apply U.S. law to foreign nationals on the high seas absent a U.S. nexus. This Court should not assume the Framers silently authorized Congress to act in a manner they understood to be illegitimate just because they did not expressly forbid the practice.

The Framers' consideration of whether to give the felonies power to the States likewise demonstrates the limited reach of Congress's jurisdiction. The Framers decided not to allow States to define and punish felonies because, "[i]f the laws of the States were to prevail on this subject, *the citizens of different States* would be subject to different punishments for the same offence at sea." Farrand,

*supra*, at 316 (emphasis added). This decision provides strong evidence that the Felonies Clause incorporates a nexus requirement because the Framers did not contemplate that the United States' definition of felonies would apply to foreign nationals on the high seas without a U.S. nexus.

### B. Founding-era practices confirm that Congress's authority under the Felonies Clause is limited by a nexus requirement.

Founding-era practices also confirm that Congress can only act under the Felonies Clause when there is a U.S. nexus. This Court has never considered these practices, which further supports granting *en banc* review to consider them now because "postfounding practice is entitled to 'great weight'" in interpreting the Constitution. *NLRB v. Noel Canning*, 573 U.S. 513, 526 (2014); *Mistretta v. United States*, 488 U.S. 361, 401 (1989).

Most notably, Britain's application of its own laws to U.S. citizens on the high seas was one of the United States' main justifications for the War of 1812. While addressing Congress, then-President James Madison emphasized that:

> British cruisers have been in the continued practice of violating the American flag on the great highway of nations, and of seizing and carrying off persons sailing under it, not in the exercise of a belligerent right founded on the law of nations against an enemy, but of a *municipal prerogative* over British subjects.

Madison, Special Message to Congress on the Foreign Policy Crisis – War Message (June 1, 1812) (emphasis added). According to Madison, "British

jurisdiction is thus extended to neutral vessels in a situation where no laws can operate but the law of nations and the laws of the country to which the vessels belong." *Id.* Madison thus reiterated the same principle he expounded in Federalist No. 42 and during debates over the Felonies Clause—that a nation has no authority to apply its own laws to foreign nationals traveling on foreign-flagged vessels on the high seas.

Long before the War of 1812, Thomas Jefferson, while serving as Secretary of State, expressed the same views on behalf of the nascent Federal Government. Jefferson, like Madison, believed that nations had only "personal jurisdiction" on the high seas, meaning jurisdiction "which reaches their own citizens only." Letter from Thomas Jefferson to Edmond Charles Genet (June 17, 1793). Jefferson echoed Madison's pre- and post-founding statements that a nation's authority to criminalize conduct on the high seas did not extend to foreigners on foreign-flagged vessels. The limitation recognized by Madison and Jefferson—one imposed on all nations that try to criminalize conduct on the high seas—is part of the power given to Congress in the Felonies Clause.

Legislators who served as delegates to the Constitutional Convention also shared Madison and Jefferson's views. In 1800, then-Congressman (and future Chief Justice) John Marshall delivered a speech in the House about the United States' authority to criminalize the acts of a foreign national on a foreign-flagged

vessel on the high seas. Marshall repeated the principle that "no nation has any jurisdiction at sea, but over its own citizens or vessels, or offences against itself." 6 Annals of Congress 598 (1800). He then directly addressed whether the Felonies Clause overcame or embodied this inherent limitation on a nation's authority. According to Marshall, "that clause can never be construed to make to the Government a grant of power, which the people making it do not themselves possess." *Id.* at 607. Because "the people of the United States have no jurisdiction over offences committed on board a foreign ship against a foreign nation[,] . . . in framing a Government for themselves, they cannot have passed this jurisdiction to that Government." *Id.*

In sum, the Framers did not need to explicitly incorporate a nexus requirement in the Felonies Clause because they understood that all nations lacked the authority to criminalize conduct of foreign nationals aboard foreign-flagged vessels on the high seas without one.

### C. This Court's interpretation of the Felonies Clause should be reconsidered because it renders the Piracies Clause meaningless.

This Court should also grant *en banc* review to reconsider its interpretation of the Felonies Clause because its current interpretation violates the principle that "it cannot be presumed that any clause in the constitution is intended to be without effect." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). By refusing to interpret the Felonies Clause to include a nexus requirement, this Court has

inadvertently rendered Congress's separate power in the Piracies Clause meaningless.

The Piracies Clause authorizes Congress to define and punish piracies committed on the high seas. Unlike felonies, piracy can be punished by any nation regardless of whether that nation has a nexus to specific acts of piracy. That is because piracy is "an offence within the criminal jurisdiction of all nations," meaning "[i]t is against all, and punished by all." *United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 197 (1820). Thus, "all piracies and trespasses committed against the general law of nations, are enquirable, and may be proceeded against, in any nation." *Talbot v. Jansen*, 3 U.S. (3 Dall.) 133, 159-60 (1795); *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 162 (1820) (recognizing the "general practice of all nations in punishing all persons, whether natives or foreigners, who have committed [the] offense [of piracy] against any persons whatsoever").

The Framers acknowledged and accepted this principle of universal jurisdiction at the founding. *See U.S. v. Palmer*, 16 U.S. (3 Wheat.) 610, 630 (1818). The United States, like all other nations, can criminalize piracy regardless of whether the offenders have a U.S. nexus. But Congress's power under the Piracies Clause is limited. Piracy has a specific definition: "robbery on the high seas." *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1248 (11th Cir. 2012). Congress cannot define any felony as a punishable act of piracy without regard to

its U.S. nexus to evade Article I's limits on its power. Instead, there is a distinction between "general piracy" and "municipal piracy." *United States v. Dire*, 680 F.3d 446, 455 (4th Cir. 2012). General piracy is subject to definition and punishment under the Piracies Clause. It "is created by international consensus," and is therefore "restricted in substance to those offenses that the international community agrees constitute piracy." *Id.* Municipal piracy, by contrast, is statutory. It "is flexible enough to cover virtually any overt act Congress chooses to dub piracy," but "is necessarily restricted to those acts that have a jurisdictional nexus with the United States." *Id.*

The Supreme Court recognized this distinction in *Furlong*. There, the Court held that the United States could not punish murder "committed by a foreigner upon a foreigner in a foreign ship." *Furlong*, 18 U.S. (5 Wheat.) at 197. In so holding, the Court relied on the "well-known distinctions between the crimes of piracy and murder." *Id.* at 196-97. Murder, unlike the crime of piracy, had not "been brought within th[e] universal jurisdiction" of all nations. *Id.* at 197. Thus, the Court determined, "punishing [murder] . . . in the vessel of another nation . . . has not been acknowledged as a right, much less an obligation." *Id.* Stated differently, because murder was not a recognized piracy offense, it could not be punished absent a U.S. nexus. *See Bellaizac-Hurtado*, 700 F.3d at 1249 ("Congress may not define murder as 'piracy' to punish it under the Piracies

Clause"); *Palmer*, 16 U.S. (3 Wheat.) at 641-42 (Johnson, J., dissenting) ("Congress can inflict punishment on offences committed on board the vessels of the United States, or by citizens of the United States, anywhere; but congress cannot make that piracy which is not piracy by the law of nations, in order to give jurisdiction to its own courts over such offences.").

Separate interpretations of the Piracies and Felonies Clauses are necessary to ensure that both have independent, nonredundant meanings. The distinction between piracy and other felonies (like murder) shows that piracy can be punished without a U.S. nexus while felonies require one. But, without addressing the redundancy it was creating, this Court previously relied on the United States' ability to punish *piracy* without a U.S. nexus to support its holding that the *Felonies Clause* lacks a nexus requirement: "there can be no doubt of the right of the legislature to enact laws *punishing pirates*, although they may be foreigners, and may have committed no particular offence against the United States." *Saac*, 632 F.3d at 1209 (emphasis added). *En banc* review is warranted because, contrary to *Saac*, the *Piracies Clause's* lack of a nexus requirement supports, rather than refutes, the existence of such a requirement in the *Felonies Clause*.

Congress has the authority to define and punish internationally recognized acts of piracy regardless of whether those acts have a U.S. nexus. And it also has the separate-and-distinct authority to define and punish non-piratical felonies

committed on the high seas, but only if those felonies have a U.S. nexus. Unlike the Court's current precedent, this interpretation gives both the Piracies and Felonies Clauses independent, nonredundant meanings. The Piracies Clause applies to a limited subset of "felonies," but is expansive in its territorial reach. The Felonies Clause, conversely, covers the broad spectrum of felonies defined by Congress, but is limited by the nexus requirement, a requirement that does not constrain Congress when acting pursuant to the Piracies Clause. By allowing Congress to act under the Felonies Clause *without* a nexus, this Court has made it unnecessary for Congress to ever resort to its Piracies Clause power. It can instead define any felony it choses without regard to a nexus or international consensus.

### D. Section 2237(a)(2)(B) exceeds Congress's authority under the Felonies Clause by criminalizing conduct without a U.S. nexus.

Petitioners are Jamaican nationals. When the Coast Guard stopped them, they were aboard a Jamaican-flagged vessel on the high seas traveling towards Haiti. *Supra* at 3. Congress could not criminalize their statements under the Felonies Clause, and the United States could not prosecute them, because Petitioners' conduct had no nexus to the United States. The District Court therefore lacked jurisdiction to enter judgments of conviction against them.

## II. The District Court had jurisdiction to consider Petitioners' Due Process Clause claim.

The Panel correctly recognized that "the doctrine of procedural default does not apply to a claim of jurisdictional error," but it erred in holding that Petitioners' Due Process Clause claim is not jurisdictional. Op. at 6-8 & n.2. The Panel's decision is contrary to Circuit precedent and should be reheard by the Panel or reviewed *en banc*.

A claim is jurisdictional if it "can be resolved by examining the face of the indictment or the record at the time of the plea without requiring further proceedings." *United States v. Tomeny*, 144 F.3d 749, 751 (11th Cir. 1998); *Saac*, 632 F.3d at 1208; *United States v. Peter*, 310 F.3d 709, 713 (11th Cir. 2002). Petitioners' due process claim satisfies this standard. The Due Process Clause prohibited their convictions because they are Jamaican nationals aboard a Jamaican-flagged vessel on the high seas, traveling towards Haiti, when the Coast Guard forcibly stopped and questioned them. These facts were in the record before the District Court at the time Petitioners entered their guilty pleas and are undisputed. *Supra* at 3. Under *Tomeny*, *Saac*, and *Peter*, Petitioners' due process claim is jurisdictional and not subject to procedural default.

In holding otherwise, the Panel did not cite this Court's precedent. Instead, it reasoned, without citation, that "Petitioners' specific Due Process Clause arguments are rooted in whether *their* due process rights were violated, not

whether the district court had jurisdiction." Op. at 7. Contrary to the Panel's holding, however, Petitioners' due process challenge *is* jurisdictional. None of this Court's prior decisions modify the jurisdictional test for a claim under the Due Process Clause. Petitioners argue that, under the Due Process Clause, section 2237(a)(2)(B) cannot apply to them because the record shows they are foreign nationals who were on a foreign-flagged vessel with no U.S. connections and were convicted of a crime that is not contrary to the laws of all reasonably developed legal systems. (Opening Br. of Petitioners-Appellants at 18-26 (May 5, 2020); Reply Br. of Petitioners-Appellants at 3-22 (Aug. 14, 2020).) If Petitioners are correct, then "the Government affirmatively alleged a specific course of conduct that is outside the reach of the . . . statute." *Peter*, 310 F.3d at 715; *see also United States v. Skinner*, 25 F.3d 1314, 1317 (6th Cir. 1994) (due process challenge for vagueness raises "a jurisdictional defect"); *United States v. Van Der End*, 943 F.3d 98, 105 (2d Cir. 2019) (claim that due process requires "a nexus to the United States is a purely legal question on which the government's constitutional power to prosecute [defendant] turns").

The Panel erred in *sua sponte* holding that the District Court lacked jurisdiction over Petitioners' Due Process Clause claim.

## CONCLUSION

The Court should grant rehearing or rehearing *en banc*.

September 13, 2021

Respectfully submitted,

/s/ Patrick N. Petrocelli

Patrick N. Petrocelli
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400
ppetrocelli@stroock.com

Steven M. Watt
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7870
swatt@aclu.org

Daniel B. Tilley
ACLU FOUNDATION OF FLORIDA
4343 W. Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714
DTilley@aclufl.org

Jonathan Hafetz
1109 Raymond Boulevard
Newark, NJ 07102
(917) 355-6896
jonathan.hafetz@shu.edu

*Attorneys for Petitioners-Appellants Robert Dexter Weir, David Roderick Williams, and Luther Fian Patterson*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this petition complies with the 3,900 word type-volume limitation contained in Federal Rule of Appellate Procedure 35(b)(2), because it contains 3,897 words, as counted by Microsoft Word, excluding the items that may be excluded under 11th Cir. R. 35-1.

I further certify that this petition was filed in electronic format through the Court's CM/ECF system on the 13th day of September, 2021.

Dated: September 13, 2021

/s/ Patrick N. Petrocelli
Patrick N. Petrocelli

**CERTIFICATE OF SERVICE**

I certify that on September 13, 2021, the foregoing Petition for Panel Rehearing or Rehearing *En Banc* was filed with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Patrick N. Petrocelli
Patrick N. Petrocelli

# ADDENDUM

## TABLE OF CONTENTS

**Page**

Panel Opinion, *Weir v. United States*,
No. 20-11188 (11th Cir. July 29, 2021)....................................................ADD-1

U.S. Const., Art. I, § 8, cl. 10........................................................................ADD-22

U.S. Const., Amend. V .......................................................................................ADD-23

18 U.S.C. § 2237 ..................................................................................................ADD-24

2 Farrand, The Records of the Federal Convention of 1787 (excerpt)..........ADD-27

6 Annals of Congress 596-620 (1800)...........................................................ADD-29

Letter from Thomas Jefferson to Edmond Charles Genet............................ADD-42

Madison, Special Message to Congress on the Foreign
Policy Crisis – War Message (June 1, 1812)............................................ADD-45

The Federalist No. 42 (Madison)....................................................................ADD-48

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

---

No. 20-11188

---

D.C. Docket Nos. 1:19-cv-23420-UU,
1:17-cr-90877-UU-1

ROBERT DEXTER WEIR, et al.,

Petitioners-Appellants,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

---

Appeal from the United States District Court
for the Southern District of Florida

---

(July 29, 2021)

Before MARTIN, ROSENBAUM, and LUCK, Circuit Judges.

PER CURIAM:

Robert Dexter Weir, David Roderick Williams, and Luther Fian Patterson ("Petitioners"), Jamaican nationals, appeal the denial of their petition for a writ of error coram nobis. Petitioners were convicted of providing materially false

information to the Coast Guard about their destination in violation of 18 U.S.C. § 2237(a)(2)(B). They argue that their convictions violate the Due Process Clause and the High Seas Clause of the U.S. Constitution. After careful consideration, and with the benefit of oral argument, we affirm in part and reverse in part. The district court lacked jurisdiction to deny Petitioners' Due Process Clause claim on the merits, so we reverse that ruling and remand the case with instructions to dismiss that claim for lack of jurisdiction. However, the district court had jurisdiction to consider Petitioners' High Seas Clause claims and correctly denied those claims, so we affirm that ruling.

## I. BACKGROUND

On September 14, 2017, the U.S. Coast Guard spotted a vessel, later identified as the Jossette, speeding towards Haiti from the direction of Jamaica. The Coast Guard launched a small boat to investigate and intercept the Jossette. The Coast Guard approached and attempted to stop the Jossette, but the vessel quickly began to flee. As the Coast Guard pursued the Jossette, the Coast Guard watched its crew toss approximately 20 to 25 bales of suspected contraband into the water. The Coast Guard officers eventually drew their weapons, and the Jossette ended the chase, stopping in international waters near Haiti.

Weir, the Jossette's captain, told the Coast Guard that the vessel was registered in Jamaica. The Coast Guard contacted Jamaica, which confirmed

registration of the Jossette and authorized the Coast Guard to board and search the vessel. When asked about the destination of the Jossette, each member of the crew, including Petitioners, told the Coast Guard that the vessel's destination was the waters near the coast of Jamaica, where they were going to fish. However, that statement was false, as the Jossette's actual destination was Haiti.

On October 18, 2017, Petitioners were named in a criminal complaint alleging a violation of the Maritime Drug Law Enforcement Act ("MDLEA"). See 46 U.S.C. §§ 70503(a)(1), 70506(b). An affidavit in support of the criminal complaint stated that the Coast Guard retrieved several bales in nearby waters matching the description of the bales tossed overboard by the Jossette's crew, which tested positive for marijuana. But later, the government admitted that the Coast Guard did not find any drugs on board the Jossette and that ion scans used to test for illicit substances showed no indication that marijuana had been on board. As such, the government was not sure it could have shown beyond a reasonable doubt that the marijuana was connected to the Jossette.

On December 13, 2017, the government filed an information charging each Petitioner solely with "knowingly and intentionally provid[ing] materially false information to a Federal law enforcement officer during a boarding of a vessel regarding the vessel's destination," in violation of 18 U.S.C. § 2237(a)(2)(B). The information stated that Petitioners "represented to a Coast Guard officer that the

vessel's destination was the waters near Jamaica, when in truth and in fact, . . . the vessel's destination was Haiti." Petitioners agreed to plead guilty to this single-count information.

The district court sentenced each Petitioner to ten months of imprisonment and one year of supervised release. They were later released from custody and subsequently removed from the United States to Jamaica. As a result of their convictions, Petitioners are prohibited from reentering the United States without permission.

On August 15, 2019, Petitioners filed a petition for a writ of error coram nobis. Coram nobis is a "remedy available to vacate a conviction when the petitioner has served his sentence and is no longer in custody." United States v. Peter, 310 F.3d 709, 712 (11th Cir. 2002) (per curiam). Petitioners challenged their convictions under section 2237(a)(2)(B) on three constitutional grounds: one challenge under the Due Process Clause and two challenges under the High Seas Clause. Petitioners argued that under those clauses Congress lacked the authority to criminalize their extraterritorial conduct and the district court lacked jurisdiction to convict them. The government opposed the petition. As part of its opposition, the government included a declaration from an officer with the Coast Guard, as designee of the Secretary of State, which was dated November 3, 2017 (the "Secretary of State Declaration" or the "Declaration"). The Declaration stated,

"[o]n September 14, 2017, the Government of Jamaica . . . authorized United States law enforcement to board and search" the Jossette. The Declaration also stated, "[o]n October 9, 2017, the Government of Jamaica consented to the exercise of jurisdiction by the United States." The district court denied the coram nobis petition, finding that Petitioners did not procedurally default their claims and that Petitioners' convictions did not violate the Due Process Clause or the High Seas Clause. This is Petitioners' appeal.

## II. DISCUSSION

We review jurisdictional questions de novo. United States v. Bane, 948 F.3d 1290, 1294 (11th Cir. 2020). We review for abuse of discretion a district court's denial of a coram nobis petition. Gonzalez v. United States, 981 F.3d 845, 850 (11th Cir. 2020). A district court abuses its discretion if it makes an error of law or makes a finding of fact that is clearly erroneous. Id. On appeal, Petitioners argue that the district court erred in denying their coram nobis petition and continue to challenge their convictions under 18 U.S.C. § 2237(a)(2)(B) on three grounds: one challenge under the Due Process Clause and two challenges under the High Seas Clause.[1] We address these challenges in turn.

[1] As the District Court observed, "Petitioners do not clearly state whether they are mounting a facial or an as-applied challenge to 18 U.S.C. § 2237(a)(2)(B)." Because Petitioners' briefing in our Court appears to address the constitutionality of their convictions specifically, as opposed to the constitutionality of section 2237(a)(2)(B) more broadly, we treat their claims as as-applied challenges. See, e.g., Appellants' Br. at 14 ("Petitioners' convictions violate the Due

### A. Due Process Clause Challenge

We do not reach the merits of Petitioners' Due Process Clause claim because we conclude the district court lacked jurisdiction over this claim. A court has jurisdiction over a coram nobis petition "only when the error alleged is of the most fundamental character and when no statutory remedy is available or adequate." Lowery v. United States, 956 F.2d 227, 228–29 (11th Cir. 1992) (per curiam) (citation and quotation marks omitted). As such, when a petitioner "fail[s] to pursue" a claim through a "remedy that is both available and adequate," the court cannot review the claim because a procedural default is a jurisdictional barrier to coram nobis relief. See id. at 229. However, this "doctrine of procedural default does not apply" to claims of jurisdictional error. Peter, 310 F.3d at 712–13. This is because a "jurisdictional error implicates a court's power to adjudicate the matter before it, [and] such error can never be waived by parties to litigation." Id. at 712; see also id. at 715–16 ("When a court without jurisdiction convicts and sentences a defendant, the conviction and sentence are void from their inception[.] . . . Accordingly, a writ of error coram nobis must issue to correct the judgment that the court never had power to enter.").

---

Process Clause."); id. at 26 ("Petitioners' convictions also separately violate the High Seas Clause for two distinct reasons.").

Here, Petitioners could have raised their Due Process Clause claim earlier in the criminal proceeding itself or in a 28 U.S.C. § 2255 petition. And they never provided "sound reasons for failing to seek relief earlier." United States v. Mills, 221 F.3d 1201, 1204 (11th Cir. 2000). Because they failed to pursue these available and adequate remedies, they procedurally defaulted this claim.

And although the doctrine of procedural default does not apply to a claim of jurisdictional error, this claim does not raise such an error. To be sure, Petitioners broadly assert that the district court "lacked jurisdiction to accept [their] guilty pleas" and note that such jurisdictional arguments are "not waivable or subject to procedural default." Even so, Petitioners' specific Due Process Clause arguments are rooted in whether their due process rights were violated, not whether the district court had jurisdiction. See, e.g., Appellants' Br. at 3 ("Section 2237(a)(2)(B) did not provide the constitutionally required notice to Petitioners."); id. at 14 ("Petitioners' convictions violate the Due Process Clause."); cf. id. at 15 (arguing the government "lacked jurisdiction to prosecute Petitioners" based on their High Seas Clause challenge).

Petitioners therefore procedurally defaulted their as-applied Due Process Clause challenge, and thus the district court lacked jurisdiction to consider it. Because the district court reached the merits of this claim, we must reverse that

ruling and remand the case with instructions to dismiss the claim for lack of jurisdiction.

**B. High Seas Clause Challenges**

We now consider Petitioners' two High Seas Clause claims.[2] The Define and Punish Clause of the Constitution authorizes Congress to (1) define and punish piracies, (2) define and punish felonies committed on the high seas, and (3) define and punish offenses against the law of nations. United States v. Campbell, 743 F.3d 802, 805 (11th Cir. 2014); see U.S. Const. Art. I, § 8, cl. 10. The second grant of power is often called the High Seas Clause (or the Felonies Clause), which is the clause at issue here. Petitioners raise two challenges under the High Seas Clause.

First, Petitioners argue the "power conferred by the High Seas Clause can only be exercised when the proscribed conduct has a nexus to the United States," and they say "there was no such nexus here." Petitioners admit this argument is "contrary to binding precedent" in this Circuit. Indeed, this Court has "rejected the

[2] The doctrine of procedural default does not apply to Petitioners' High Seas Clause claims. If Congress did not validly enact section 2237(a)(2)(B) under the High Seas Clause, then the District Court lacked jurisdiction to convict Petitioners of that offense. See United States v. Saac, 632 F.3d 1203, 1208–09 (11th Cir. 2011) (addressing an "argument that Congress lacked the authority to enact" a statute under the High Seas Clause and holding "[t]he constitutionality of . . . the statute under which defendants were convicted[] is a jurisdictional issue"). And "the doctrine of procedural default does not apply" to a claim of jurisdictional error. Peter, 310 F.3d at 712–13.

same argument that defendants make here—that Congress exceeded its constitutional authority under the High Seas Clause in passing a statute that punishes conduct without a nexus to the United States." Saac, 632 F.3d at 1210. Our precedent therefore requires us to reject Petitioners' first challenge.

Second, Petitioners say that under the High Seas Clause, this Court "has consistently held that the extraterritorial application of United States law still must be supported by a principle of extraterritorial jurisdiction recognized by customary international law." Petitioners argue the extraterritorial application of section 2237(a)(2)(B) violates the High Seas Clause because it is not supported by international law. The district court rejected this claim because it found the application of section 2237(a)(2)(B) satisfied various principles of international law.

In response to Petitioners' position, the government argues that Petitioners conflate the question of whether Congress had the authority to enact section 2237(a)(2)(B) under its enumerated powers with the separate question of whether that authority must be supported by a principle of international law. In any event, the government says the extraterritorial application of section 2237(a)(2)(B) here is "fully consistent with international law," so "this Court need not resolve whether the High Seas Clause is constrained by international law." Instead, the government

says this Court can "assume that it is and conclude that such limits are satisfied" on these facts.

Thus, Petitioners' and the government's arguments present two issues. First, we consider whether the extraterritorial application of section 2237(a)(2)(B) here satisfied a principle of international law. Second, we address whether Congress had the constitutional authority to enact section 2237(a)(2)(B) under its enumerated powers. We discuss each issue in turn.

1. Principles of International Law

Again, Petitioners argue that the extraterritorial application of section 2237(a)(2)(B) violated the High Seas Clause because it did not comply with a principle of international law. We recognize that this Court has addressed principles of international law together with Congress's authority under the High Seas Clause. See, e.g., Saac, 632 F.3d at 1210 ("We now conclude that the [Drug Trafficking Vessel Interdiction Act] is also justified under the universal principle [of international law] and thus a constitutional exercise of Congress's power under the High Seas Clause."). As such, we consider here whether the extraterritorial application of section 2237(a)(2)(B) satisfied a principle of international law. "The law of nations permits the exercise of extraterritorial criminal jurisdiction by a nation under five general principles. They are the territorial, national, protective, universality and passive personality principles." United States v. Romero-Galue,

757 F.2d 1147, 1154 n.20 (11th Cir. 1985) (alteration adopted and quotation marks omitted).

We start with the territorial principle, which was one of the principles relied on by the district court. Under that principle, a nation has jurisdiction to apply its law in another nation's territory to the extent provided by international agreement with that other nation. United States v. Ibarguen-Mosquera, 634 F.3d 1370, 1379 & n.6 (11th Cir. 2011). The district court found the extraterritorial application of section 2237(a)(2)(B) satisfied the territorial principle because Jamaica, the Jossette's flag nation, consented to the Coast Guard's interference with the Jossette as well as to U.S. jurisdiction. For support, the district court cited decisions by our sister circuits holding that the extraterritorial application of U.S. law to a foreign vessel in international waters satisfies the territorial principle when the vessel's flag nation consents. See United States v. Cardales, 168 F.3d 548, 553 (1st Cir. 1999) ("In this case, the Venezuelan government authorized the United States to apply United States law to the persons on board [a Venezuelan vessel]. Therefore, jurisdiction in this case is consistent with the territorial principle of international law."); United States v. Robinson, 843 F.2d 1, 4 (1st Cir. 1988) (Breyer, J.) (holding that the vessel's flag nation's consent satisfied the territorial principle, a "perfectly adequate basis in international law for the assertion of American jurisdiction"); United States v. Suerte, 291 F.3d 366, 375 (5th Cir. 2002) ("Malta,

under whose flag Suerte's vessel was registered, consented to the boarding and search of his vessel, as well as to the application of United States law. A flag nation's consent to a seizure on the high seas constitutes a waiver of that nation's rights under international law.").

We agree with the district court's and our sister circuits' application of the territorial principle. Again, the territorial principle says the United States has jurisdiction to apply its law in another nation's territory to the extent provided by international agreement with that other nation. See Ibarguen-Mosquera, 634 F.3d at 1379 & n.6. Similarly, although a foreign-flagged private vessel is usually "not subject to interference on the high seas" by other nations, as it is subject to the flag nation's "exclusive" jurisdiction, "interference with a ship that would otherwise be unlawful under international law is permissible if the flag state has consented." Restatement (Third) of the Foreign Relations Law of the United States §§ 502(2) & cmt. d, 522(2) & cmt. e (emphasis added) [hereinafter "Restatement"].[3] In other words, when a flag nation consents to the United States interfering with its vessel in international waters or to U.S. jurisdiction over the vessel, that is the "international agreement" under the territorial principle that allows the United

[3] See Sosa v. Alvarez-Machain, 542 U.S. 692, 733–34, 737, 124 S. Ct. 2739, 2766–68 (2004) (citing the Restatement as a "recognized" source of "the current state of international law" because it is "the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat").

States to apply its law extraterritorially to that vessel. See Ibarguen-Mosquera, 634 F.3d at 1379 n.6. And the flag nation's consent can be given through a formalized agreement, such as a treaty, or through informal means. See Robinson, 843 F.2d at 4 (stating "nations may agree through informal, as well as formal, means" under the territorial principle); Suerte, 291 F.3d at 376 (citing Restatement § 301 & cmt. b) (stating that such agreements "may be made informally" because "international agreements need not be formalized"). Therefore, consistent with the territorial principle of international law, the United States may interfere with and exercise jurisdiction over a foreign vessel in international waters to the extent provided by consent of the vessel's flag nation.[4]

Applying this principle here, the record shows the extraterritorial application of section 2237(a)(2)(B) to Petitioners satisfied the territorial principle because

---

[4] Petitioners argue that consent of a foreign nation is insufficient to support the extraterritorial application of U.S. law. For support, they cite United States v. Bellaizac-Hurtado, 700 F.3d 1245 (11th Cir. 2012). In Bellaizac-Hurtado, while noting that Panama consented to U.S. prosecution of the defendants, this Court held that "drug trafficking is not an 'Offence[] against the Law of Nations,'" and thus Congress could not "constitutionally proscribe the defendants' conduct under the Offences Clause." Id. at 1247–48. Under the Offences Clause, Congress only has authority to punish conduct that violates the law of nations. Id. at 1249. Petitioners argue that a foreign nation's consent must be insufficient to support the extraterritorial application of U.S. law because otherwise "Panama's consent would have ended the inquiry and resort to the authority conferred by the Offences Clause would have been unnecessary." Bellaizac-Hurtado is inapplicable. In that case, this Court only decided that Congress lacked authority to proscribe the defendants' conduct under the Offences Clause because it was not a violation of the law of nations. The Court never addressed the separate question at issue here—whether Congress's exercise of its authority under its enumerated powers satisfied a principle of international law, such as the territorial principle. Bellaizac-Hurtado therefore does not foreclose our holding here.

Jamaica, the Jossette's flag nation, consented to U.S. interference with the Jossette and to U.S. jurisdiction. As an initial matter, the Secretary of State Declaration says Jamaica "authorized United States law enforcement to board and search" the Jossette on September 14, 2017, which means Jamaica consented to U.S. interference with the vessel the very same day the Coast Guard boarded the Jossette and Petitioners provided the false information. Even so, Petitioners note the Declaration says Jamaica did not consent to U.S. jurisdiction until October 9, 2017, whereas Petitioners provided the false information about three weeks prior on September 14. Based on this chronology, Petitioners argue the United States lacked jurisdiction over them. But while the Declaration says Jamaica consented to U.S. jurisdiction on October 9, 2017, this date preceded the criminal complaint against Petitioners, which was filed on October 18, 2017; this date preceded the information charging Petitioners with violating section 2237(a)(2)(B), which was filed in December 2017; and this date was before the district court entered judgment in January 2018. The Declaration thus shows that Jamaica consented to U.S. jurisdiction over Petitioners before the criminal case began.[5]

---

[5] The United States and Jamaica also have an agreement under which one nation can consent to the extraterritorial application of the other nation's law. See Agreement Between the Government of the United States and the Government of Jamaica Concerning Cooperation in Suppressing Illicit Maritime Drug Trafficking, State Dep't No. 98-57, 1998 WL 190434 (Mar. 10, 1998). For instance, under the agreement, one nation can "waive its right to exercise jurisdiction" over its vessel and "authorize the other [nation] to enforce its law against the vessel, its cargo and persons on board." Id. at Art. 3(5). Although this agreement is geared towards "combatting illicit maritime drug traffic," id. at Art. 1, the record here shows that the Coast

Petitioners say the Declaration should not be considered because it was not part of the record in their criminal case. Rather, the government included the Declaration as part of its opposition to the coram nobis petition. We reject Petitioners' assertion. Petitioners never challenged the United States' jurisdiction until they filed their coram nobis petition. The government therefore had no need to proffer the Declaration until it filed its opposition to the petition. We have allowed the government to "submit evidence in support of its assertion that [an individual's] vessel was subject to the jurisdiction of the United States" when the individual's "failure to challenge the district court's jurisdiction [was] at least partially responsible for the lack of a developed record." United States v. Iguaran, 821 F.3d 1335, 1338 (11th Cir. 2016) (per curiam) (quotation marks omitted). And it's not as if the Declaration was cobbled together in an attempt to gin up U.S. jurisdiction once Petitioners challenged it in their petition. To the contrary, the Declaration was dated November 3, 2017, which was two months before the district court entered judgment in the criminal case and almost two years before Petitioners sought coram nobis relief.

This record thus demonstrates that Jamaica, the Jossette's flag nation, consented to U.S. interference with the Jossette and to U.S. jurisdiction.

---

Guard suspected Petitioners of trafficking drugs and that the government originally intended to charge Petitioners for trafficking drugs. As such, this agreement also demonstrates Jamaica's consent under the territorial principle.

Therefore, the extraterritorial application of section 2237(a)(2)(B) to Petitioners satisfied the territorial principle of international law.[6]

2. Congress's Authority to Enact Section 2237(a)(2)(B)

We now consider whether section 2237(a)(2)(B) was a valid enactment under Congress's enumerated powers. Among other powers, the government argues that section 2237(a)(2)(B) was a valid enactment under Congress's powers in the High Seas Clause and the Necessary and Proper Clause. In its view, Congress has authority to criminalize designated felonies in international waters under the High Seas Clause, and section 2237(a)(2)(B), which prohibits providing materially false information to federal law enforcement, is "necessary" to "enforce United States laws criminalizing designated felonies on the high seas."

The Necessary and Proper Clause grants Congress "broad authority to enact federal legislation," as the Clause makes clear that "the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are convenient, or useful or conducive to the authority's beneficial exercise." United States v. Belfast, 611 F.3d 783, 804 (11th Cir. 2010) (quotation marks omitted). In considering whether the Necessary and Proper Clause authorizes Congress to enact a particular federal statute, we "look to see whether the statute

[6] Because we hold that the extraterritorial application of section 2237(a)(2)(B) to Petitioners satisfied the territorial principle of international law, we need not consider the government's arguments on other principles of international law.

constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." Id. (quotation marks omitted).

This Court has held that the MDLEA was a valid enactment under the High Seas Clause. See United States v. Estupinan, 453 F.3d 1336, 1338–39 (11th Cir. 2006) (per curiam). The MDLEA makes it unlawful for a person to "knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance" while on board "a vessel subject to the jurisdiction of the United States." 46 U.S.C. § 70503(a)(1), (e)(1). This Court has also held that the Drug Trafficking Vessel Interdiction Act ("DTVIA") was a valid enactment under the High Seas Clause. See Saac, 632 F.3d at 1210. The DTVIA prohibits the operation of a submersible or semi-submersible vessel without nationality in territorial waters with the intent to evade detection. See 18 U.S.C. § 2285(a). Because we've established that the MDLEA and the DTVIA were valid enactments under the High Seas Clause, we next consider whether section 2237(a)(2)(B) was "convenient, . . . useful[,] or conducive" or "rationally related" to Congress's implementation of its enumerated power under the High Seas Clause in the MDLEA and the DTVIA. See Belfast, 611 F.3d at 804 (emphasis and quotation marks omitted).

When the Coast Guard or other federal law enforcement seeks to enforce the MDLEA or the DTVIA in international waters, materially false information can

hamper that enforcement. Section 2237(a)(2)(B) therefore helps deter such false information by imposing criminal sanctions, including a fine and/or imprisonment for up to five years. See 18 U.S.C. § 2237(b)(1). Indeed, section 2237(a)(2)(B) was enacted to support "law enforcement at sea." H.R. Rep. No. 109-333, at 103 (2005) (Conf. Rep.). As such, section 2237(a)(2)(B) was rationally related to Congress's implementation of its enumerated power under the High Seas Clause in the MDLEA and the DTVIA.[7] Belfast, 611 F.3d at 804. And even though Petitioners were not convicted of violating the MDLEA or the DTVIA, the record shows the Coast Guard suspected Petitioners of trafficking drugs when it asked about their destination. Also, the government originally intended to charge Petitioners under the MDLEA for trafficking drugs. On these facts, section 2237(a)(2)(B) was rationally related to the implementation of the MDLEA and is therefore a valid enactment under the High Seas Clause and the Necessary and Proper Clause.

## III. CONCLUSION

In sum, the district court lacked jurisdiction to deny Petitioners' Due Process Clause claim on the merits, so we reverse that ruling and remand the case with instructions to dismiss that claim for lack of jurisdiction. However, the district

[7] The government argues section 2237(a)(2)(B) was also a valid enactment under other enumerated powers. Because we hold that it was a valid enactment under the High Seas Clause and the Necessary and Proper Clause, we need not consider the government's other arguments.

court had jurisdiction to consider Petitioners' High Seas Clause claims and correctly denied those claims, so we affirm that ruling.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 29, 2021

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 20-11188-HH
Case Style: Robert Weir, et al v. USA
District Court Docket No: 1:19-cv-23420-UU
Secondary Case Number: 1:17-cr-20877-UU-1

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. <u>See</u> 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. <u>See</u> 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Christopher Bergquist, HH at 404-335-6169.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion

U.S.C.A. Const. Art. I § 8, cl. 10

Section 8, Clause 10. Piracies and Felonies on the High Seas; Offenses Against the Law of Nations

Currentness

The Congress shall have Power . . . To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations;

Notes of Decisions (32)

U.S.C.A. Const. Art. I § 8, cl. 10, USCA CONST Art. I § 8, cl. 10
Current through PL 117-39.

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Constitution of the United States
Annotated
Amendment V. Grand Jury; Double Jeopardy; Self-Incrimination; Due Process; Takings

U.S.C.A. Const. Amend. V-Due Process

Amendment V. Due Process clause [Text & Notes of Decisions subdivisions I to IX]

Currentness

<Notes of Decisions for this clause are displayed in multiple documents. For text, historical notes, and references, see first document for Amendment V.>

No person shall be * * * deprived of life, liberty, or property, without due process of law; * * *

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for clauses of this amendment:>

<USCA Const. Amend. V--Grand Jury clause>

<USCA Const. Amend. V--Double Jeopardy clause>

<USCA Const. Amend. V--Self-Incrimination clause>

<USCA Const. Amend. V-- Due Process clause>

<USCA Const. Amend. V--Takings clause>

Notes of Decisions (3315)

U.S.C.A. Const. Amend. V-Due Process, USCA CONST Amend. V-Due Process
Current through PL 117-39.

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 18. Crimes and Criminal Procedure (Refs & Annos)
Part I. Crimes (Refs & Annos)
Chapter 109. Searches and Seizures (Refs & Annos)

18 U.S.C.A. § 2237

§ 2237. Criminal sanctions for failure to heave to, obstruction of boarding, or providing false information

Effective: October 15, 2010
Currentness

**(a)(1)** It shall be unlawful for the master, operator, or person in charge of a vessel of the United States, or a vessel subject to the jurisdiction of the United States, to knowingly fail to obey an order by an authorized Federal law enforcement officer to heave to that vessel.

**(2)** It shall be unlawful for any person on board a vessel of the United States, or a vessel subject to the jurisdiction of the United States, to--

**(A)** forcibly resist, oppose, prevent, impede, intimidate, or interfere with a boarding or other law enforcement action authorized by any Federal law or to resist a lawful arrest; or

**(B)** provide materially false information to a Federal law enforcement officer during a boarding of a vessel regarding the vessel's destination, origin, ownership, registration, nationality, cargo, or crew.

**(b)(1)** Except as otherwise provided in this subsection, whoever knowingly violates subsection (a) shall be fined under this title or imprisoned for not more than 5 years, or both.

**(2)(A)** If the offense is one under paragraph (1) or (2)(A) of subsection (a) and has an aggravating factor set forth in subparagraph (B) of this paragraph, the offender shall be fined under this title or imprisoned for any term of years or life, or both.

**(B)** The aggravating factor referred to in subparagraph (A) is that the offense--

**(i)** results in death; or

**(ii)** involves--

**(I)** an attempt to kill;

**(II)** kidnapping or an attempt to kidnap; or

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

**(III)** an offense under section 2241.

**(3)** If the offense is one under paragraph (1) or (2)(A) of subsection (a) and results in serious bodily injury (as defined in section 1365), the offender shall be fined under this title or imprisoned for not more than 15 years, or both.

**(4)** If the offense is one under paragraph (1) or (2)(A) of subsection (a), involves knowing transportation under inhumane conditions, and is committed in the course of a violation of section 274 of the Immigration and Nationality Act, or chapter 77 or section 113 (other than under subsection (a)(4) or (a)(5) of such section) or 117 of this title, the offender shall be fined under this title or imprisoned for not more than 15 years, or both.

**(c)** This section does not limit the authority of a customs officer under section 581 of the Tariff Act of 1930 (19 U.S.C. 1581), or any other provision of law enforced or administered by the Secretary of the Treasury or the Secretary of Homeland Security, or the authority of any Federal law enforcement officer under any law of the United States, to order a vessel to stop or heave to.

**(d)** A foreign nation may consent or waive objection to the enforcement of United States law by the United States under this section by radio, telephone, or similar oral or electronic means. Consent or waiver may be proven by certification of the Secretary of State or the designee of the Secretary of State.

**(e)** In this section--

**(1)** the term “Federal law enforcement officer” has the meaning given the term in section 115(c);

**(2)** the term “heave to” means to cause a vessel to slow, come to a stop, or adjust its course or speed to account for the weather conditions and sea state to facilitate a law enforcement boarding;

**(3)** the term “vessel subject to the jurisdiction of the United States” has the meaning given the term in section 70502 of title 46;

**(4)** the term “vessel of the United States” has the meaning given the term in section 70502 of title 46; and

**(5)** the term “transportation under inhumane conditions” means--

**(A)** transportation--

**(i)** of one or more persons in an engine compartment, storage compartment, or other confined space;

**(ii)** at an excessive speed; or

**(iii)** of a number of persons in excess of the rated capacity of the vessel; or

**(B)** intentional grounding of a vessel in which persons are being transported.

**CREDIT(S)**

(Added Pub.L. 109-177, Title III, § 303(a), Mar. 9, 2006, 120 Stat. 233; amended Pub.L. 111-281, Title IX, § 917, Oct. 15, 2010, 124 Stat. 3021.)

Notes of Decisions (2)

18 U.S.C.A. § 2237, 18 USCA § 2237
Current through PL 117-39.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

U.S. Constitutional convention 1787

# THE RECORDS

OF THE

# FEDERAL CONVENTION

of 1787

*EDITED BY*

MAX FARRAND
PROFESSOR OF HISTORY IN YALE UNIVERSITY

VOLUME II

Circ
INDIANA UNIVERSITY
LIBRARY

NEW HAVEN: YALE UNIVERSITY PRESS
LONDON: HENRY FROWDE
OXFORD UNIVERSITY PRESS
MCMXI

3

ADD-27

On motion for striking out "and punishment" as moved by Mr ⟨Madison⟩
N. H. no. Mas. ay. Ct no. Pa ay. Del. ay– Md no. Va. ay. N– C– ay. S– C. ay– Geo. ay. [Ayes — 7; noes — 3.]

Mr Govr Morris moved to strike out "declare the law" and insert "punish" before "piracies". and on the question

N– H– ay. Mas– ay. Ct. no. Pa. ay. Del. ay. Md ay. Va. no. N. C– no. S. C– ay. Geo– ay. [Ayes — 7; noes — 3.]

Mr. M⟨adison,⟩ and Mr. Randolph moved to insert, "define &." before "punish".

Mr. Wilson thought "felonies" sufficiently defined by Common law.

Mr. Dickenson concurred with Mr Wilson

Mr Mercer was in favor of the amendment.

Mr M⟨adison.⟩ felony at common law is vague.[4] It is also defective. One defect is supplied by Stat: of Anne as to running away with vessels which at common law was a breach of trust only. Besides no foreign law should be a standard farther than is expressly adopted — If the laws of the States were to prevail on this subject, the citizens of different States would be subject to different punishments for the same offence at sea — There would be neither uniformity nor stability in the law — The proper remedy for all these difficulties was to vest the power proposed by the term "define" in the Natl. legislature.

Mr Govr. Morris would prefer *designate* to *define*, the latter being as he conceived, limited to the preexisting meaning. ——— It was said by others to be applicable to the creating of offences also, and therefore suited the case both of felonies & of piracies. ⟨The motion of Mr. M. & Mr. R was agreed to.⟩[5]

Mr. Elseworth enlarged the motion so as to read "to define and punish piracies and felonies committed on the high seas, counterfeiting the securities and current coin of the U. States, and offences agst. the law of Nations" which was agreed to, nem con.

"To subdue a rebellion in any State, on the application of its legislature"

[4] See Appendix A, CCXV.

[5] Taken from *Journal*.

ingston, Nathaniel Macon, Peter Muhlenberg, Anthony New, John Nicholas, Joseph H. Nicholson, John Randolph, John Smilie, John Smith, Samuel Smith, Richard Dobbs Spaight, Richard Stanford, David Stone, Thomas Sumter, Benjamin Taliaferro, John Thompson, Abram Trigg, John Trigg, Philip Van Cortlandt, Joseph B. Varnum, and Robert Williams.

Nays—George Baer, Bailey Bartlett, James A. Bayard, Jonathan Brace, John Brown, Christopher G. Champlin, William Cooper, William Craik, John Davenport, Franklin Davenport, John Dennis, George Dent, Joseph Dickson, William Edmond, Thomas Evans, Abiel Foster, Dwight Foster, Jonathan Freeman, Henry Glen, Chauncey Goodrich, Elizur Goodrich, William Gordon, William H. Hill, Henry Lee, Silas Lee, James Linn, John Marshall, Abraham Nott, Harrison G. Otis, Robert Page, Josiah Parker, Thomas Pinckney, Jonas Platt, Leven Powell, John Reed, John Rutledge, jun., Samuel Sewall, James Sheafe, William Shepard, George Thatcher, John Chew Thomas, Richard Thomas, Peleg Wadsworth, Robert Waln, Lemuel Williams, and Henry Woods.

The Speaker voted in the negative.

The House then resolved itself into a Committee on the Message, when Mr. Bayard proceeded, in answer to Mr. Livingston, in which he spoke about three hours. The Committee then rose, and obtained leave to sit again.

Thursday, March 6.

A message from the Senate informed the House that the Senate have passed the bill, entitled "An act declaring the assent of Congress to certain acts of the States of Maryland and Georgia," with an amendment; to which they desire the concurrence of this House.

## JONATHAN ROBBINS.

The House went into Committee of the Whole on the Message of the President, in the case of Jonathan Robbins, when Mr. Nicholas spoke about three hours in favor of the resolutions introduced by Mr. Livingston, which were negatived—yeas 34, nays 58.

Some discussion then took place on taking up the resolution presented by Mr. Bayard, which was also with the Committee of the Whole House. The Committee at length rose without entering upon it, and reported their disagreement to the resolutions proposed by Mr. Livingston; and the question whether the Committee should have leave to sit again was taken by yeas and nays, and carried—yeas 59, nays 38, as follows:

Yeas—Willis Alston, George Baer, Bailey Bartlett, James A. Bayard, John Bird, Phanuel Bishop, John Brown, Robert Brown, C. G. Champlin, Matthew Clay, John Condit, William Cooper, S. W. Dana, John Davenport, Franklin Davenport, Thomas T. Davis, John Dawson, Joseph Dickson, William Edmond, Abiel Foster, Dwight Foster, Jonathan Freeman, Albert Gallatin, Henry Glen, Chauncey Goodrich, Elizur Goodrich, Roger Griswold, Robert Goodloe Harper, Joseph Heister, David Holmes, James H. Imlay, George Jackson, John Wilkes Kittera, Henry Lee, Silas Lee, Michael Leib, Samuel Lyman, Edward Livingston, Nathaniel Macon, John Marshall, Peter Muhlenberg, Anthony New, John Nicholas, Joseph H. Nicholson, Jonas Platt, John Randolph, Samuel Sewall, John Smilie, John Smith, David Stone, Thomas Sumter, Benjamin Taliaferro, George Thatcher, Abram Trigg, John Trigg, Philip Van Cortlandt, Joseph B. Varnum, Peleg Wadsworth, and Robert Williams.

Nays—Theodorus Bailey, Jonathan Brace, Samuel J. Cabell, Gabriel Christie, William Craik, John Dennis, George Dent, Joseph Eggleston, Thomas Evans, Samuel Goode, William Gordon, Edwin Gray, Andrew Gregg, William Barry Grove, John A. Hanna, Archibald Henderson, William H. Hill, James Jones, Aaron Kitchell, Matthew Lyon, James Linn, Abraham Nott, Harrison G. Otis, Robert Page, Josiah Parker, Thomas Pinckney, Leven Powell, John Reed, John Rutledge, jun., William Shepard, Samuel Smith, Richard Dobbs Spaight, Richard Stanford, Richard Thomas, John Thompson, Robert Waln, Lemuel Williams, and Henry Woods.

The question was then before the House to agree to the report of the Committee in their disagreement with the resolutions.

Mr. Gallatin rose, and entered generally into the argument, in a speech of about two hours, after which the House adjourned.

Friday, March 7.

The amendments of the Senate to the bill declaring the assent of Congress to certain acts of the States of Maryland and Georgia were referred to the Committee of Revisal and Unfinished Business.

Mr. Spaight, from the committee appointed for that purpose, reported a bill to alter the times of holding the District Court of North Carolina; which was read a first and second time, and committed for Monday next.

Mr. Harper presented a petition of about fifty families, residing on a tract of territory ceded by the State of South Carolina to the United States, stating that they had been left unprotected and unacknowledged by any civil authority, and praying to be placed under such government as Congress in their wisdom may see fit. Referred to a select committee, to consider and report thereon.

## JONATHAN ROBBINS.

The House took up the unfinished business of yesterday, and the question, Will the House agree with the Committee of the Whole in their disagreement to Mr. Livingston's resolutions? being under consideration.

Mr. Marshall said, that believing, as he did most seriously, that in a Government constituted like that of the United States, much of the public happiness depended, not only on its being rightly administered, but on the measures of Administration being rightly understood—on rescuing public opinion from those numerous prejudices with which so many causes might combine to surround it, he could not but have been highly gratified with the very eloquent, and what was still more valuable, the very able and very correct argument which had been delivered by the gentleman from Delaware (Mr. Bayard) against the resolutions now under consideration. He had not expected that the effect of this argument would be universal;

but he had cherished the hope, and in this he had not been disappointed, that it would be very extensive. He did not flatter himself with being able to shed much new light on the subject; but, as the argument in opposition to the resolutions had been assailed with considerable ability by gentlemen of great talents, he trusted the House would not think the time misapplied which would be devoted to the reëstablishment of the principles contained in that argument, and to the refutation of those advanced in opposition to it. In endeavoring to do this, he should notice the observations in support of the resolutions, not in the precise order in which they were made; but as they applied to the different points he deemed it necessary to maintain, in order to demonstrate, that the conduct of the Executive of the United States could not justly be charged with the errors imputed to it by the resolutions.

His first proposition, he said, was that the case of Thomas Nash, as stated to the President, was completely within the 27th article of the Treaty of Amity, Commerce, and Navigation, entered into between the United States of America and Great Britain.

He read the article, and then observed: The *casus fœderis* of this article occurs, when a person, having committed murder or forgery within the jurisdiction of one of the contracting parties, and having sought an asylum in the country of the other, is charged with the crime, and his delivery demanded, on such proof of his guilt as, according to the laws of the place where he shall be found, would justify his apprehension and commitment for trial, if the offence had there been committed.

The case stated is, that Thomas Nash, having committed murder on board of a British frigate, navigating the high seas under a commission from His Britannic Majesty, had sought an asylum within the United States; on this case his delivery was demanded by the Minister of the King of Great Britain.

It is manifest that the case stated, if supported by proof, is within the letter of the article, provided a murder committed in a British frigate, on the high seas, be committed within the jurisdiction of that nation. That such a murder is within their jurisdiction, has been fully shown by the gentleman from Delaware. The principle is, that the jurisdiction of a nation extends to the whole of its territory, and to its own citizens in every part of the world. The laws of a nation are rightfully obligatory on its own citizens in every situation where those laws are really extended to them. This principle is founded on the nature of civil union. It is supported everywhere by public opinion, and is recognised by writers on the laws of nations. *Rutherforth*, in his second volume, page 180, says: "The jurisdiction which a civil society has over the persons of its members, affects them immediately, whether they are within its territories or not."

This general principle is especially true, and is particularly recognised, with respect to the fleets of a nation on the high seas. To punish offences committed in its fleet, is the practice of every nation in the universe; and consequently the opinion of the world is, that a fleet at sea is within the jurisdiction of the nation to which it belongs. *Rutherforth*, vol. ii. p. 491, says: "there can be no doubt about the jurisdiction of a nation over the persons which compose its fleets, when they are out at sea, whether they are sailing upon it or are stationed in any particular part of it."

The gentleman from Pennsylvania, (Mr. Gallatin,) though he has not directly controverted this doctrine, has sought to weaken it by observing that the jurisdiction of a nation at sea could not be complete even in its own vessels; and in support of this position he urged the admitted practice of submitting to search for contraband—a practice not tolerated on land, within the territory of a neutral Power. The rule is as stated; but is founded on a principle which does not affect the jurisdiction of a nation over its citizens or subjects in its ships. The principle is, that in the sea itself no nation has any jurisdiction. All may equally exercise their rights, and consequently the right of a belligerent Power to prevent aid being given to his enemy, is not restrained by any superior right of a neutral in the place. But, if this argument possessed any force, it would not apply to national ships-of-war, since the usage of nations does not permit them to be searched.

According to the practice of the world, then, and the opinions of writers on the law of nations, the murder committed on board of a British frigate navigating the high seas, was a murder committed within the jurisdiction of the British nation.

Although such a murder is plainly within the letter of the article, it has been contended not to be within its just construction; because at sea all nations have a common jurisdiction, and the article correctly construed, will not embrace a case of concurrent jurisdiction.

It is deemed unnecessary to controvert this construction, because the proposition, that the United States had no jurisdiction over the murder committed by Thomas Nash, is believed to be completely demonstrable.

It is not true that all nations have jurisdiction over all offences committed at sea. On the contrary, no nation has any jurisdiction at sea, but over its own citizens or vessels, or offences against itself. This principle is laid down in 2 *Ruth.* 488, 491.

The American Government has, on a very solemn occasion, avowed the same principle. The first Minister of the French Republic asserted and exercised powers of so extraordinary a nature, as unavoidably to produce a controversy with the United States. The situation in which the Government then found itself was such as necessarily to occasion a very serious and mature consideration of the opinions it should adopt. Of consequence, the opinions then declared deserve great respect. In the case alluded to, Mr. Genet had asserted the right of fitting out privateers in the American ports, and of manning them with American citizens, in order to cruise against nations with whom America was at peace. In rea-

ADD-30

soning against this extravagant claim, the then Secretary of State, in his letter of the 17th of June, 1793, says:

"For our citizens then to commit murders and depredations on the members of nations at peace with us, or to combine to do it, appeared to the Executive, and to those whom they consulted, as much against the laws of the land as to murder or rob, or combine to murder or rob its own citizens; and as much to require punishment, if done within their limits, where they have a territorial jurisdiction, or on the high seas, where they have a personal jurisdiction, that is to say, one which reaches their own citizens only; this being an appropriate part of each nation, on an element where all have a common jurisdiction."

The well considered opinion, then, of the American Government on this subject is, that the jurisdiction of a nation at sea is "personal," reaching its "own citizens only;" and that this is the "appropriate part of each nation" on that element.

This is precisely the opinion maintained by the opposers of the resolutions. If the jurisdiction of America at sea be personal, reaching its own citizens only; if this be its appropriate part, then the jurisdiction of the nation cannot extend to a murder committed by a British sailor, on board a British frigate navigating the high seas under a commission from His Britannic Majesty.

As a further illustration of the principle contended for, suppose a contract made at sea, and a suit instituted for the recovery of money which might be due thereon. By the laws of what nation would the contract be governed? The principle is general that a personal contract follows the person, but is governed by the law of the place where it is formed. By what law then would such a contract be governed? If all nations had jurisdiction over the place, then the laws of all nations would equally influence the contract; but certainly no man will hesitate to admit that such a contract ought to be decided according to the laws of that nation to which the vessel or contracting parties might belong.

Suppose a duel, attended with death, in the fleet of a foreign nation, or in any vessel which returned safe to port, could it be pretended that any Government on earth, other than that to which the fleet or vessel belonged, had jurisdiction in the case; or that the offender could be tried by the laws or tribunals of any other nation whatever?

Suppose a private theft by one mariner from another, and the vessel to perform its voyage and return in safety, would it be contended that all nations have equal cognizance of the crime, and are equally authorized to punish it?

If there be this common jurisdiction at sea, why not punish desertion from one belligerent Power to another, or correspondence with the enemy, or any other crime which may be perpetrated? A common jurisdiction over all offences at sea, in whatever vessel committed, would involve the power of punishing the offences which have been stated. Yet, all gentlemen will disclaim this power. It follows, then, that no such common jurisdiction exists.

In truth the right of every nation to punish is limited, in its nature, to offences against the nation inflicting the punishment. This principle is believed to be universally true. It comprehends every possible violation of its laws on its own territory, and it extends to violations committed elsewhere by persons it has a right to bind. It extends also to general piracy.

A pirate, under the law of nations, is an enemy of the human race. Being the enemy of all, he is liable to be punished by all. Any act which denotes this universal hostility, is an act of piracy.

Not only an actual robbery, therefore, but cruising on the high seas without commission, and with intent to rob, is piracy. This is an offence against all and every nation, and is therefore alike punishable by all. But an offence which in its nature affects only a particular nation, is only punishable by that nation.

It is by confounding general piracy with piracy by statute, that indistinct ideas have been produced, respecting the power to punish offences committed on the high seas.

A statute may make any offence piracy, committed within the jurisdiction of the nation passing the statute, and such offence will be punishable by that nation. But piracy under the law of nations, which alone is punishable by all nations, can only consist in an act which is an offence against all. No particular nation can increase or diminish the list of offences thus punishable.

It had been observed by his colleague, (Mr. Nicholas,) for the purpose of showing that the distinction taken on this subject by the gentleman from Delaware (Mr. Bayard) was inaccurate, that any vessel robbed on the high seas could be the property only of a single nation, and being only an offence against that nation, could be, on the principle taken by the opposers of the resolutions, no offence against the law of nations; but in this his colleague had not accurately considered the principle. As a man who turns out to rob on the highway, and forces from a stranger his purse with a pistol at his bosom, is not the particular enemy of that stranger, but alike the enemy of every man who carries a purse, so those who without a commission rob on the high seas, manifest a temper hostile to all nations, and therefore become the enemies of all. The same inducements which occasion the robbery of one vessel, exist to occasion the robbery of others, and therefore the single offence is an offence against the whole community of nations, manifests a temper hostile to all, is the commencement of an attack on all, and is consequently, of right, punishable by all.

His colleague had also contended that all the offences at sea, punishable by the British statutes from which the act of Congress was in a great degree copied, were piracies at common law, or by the law of nations, and as murder is among these, consequently murder was an act of piracy by the law of nations, and therefore punishable by every nation. In support of this position he had cited 1 *Hawk. P. C.* 267, 271–3, *Inst.* 112, and 1 *Woodeson* 140.

The amount of these cases is, that no new of-

fence is made piracy by the statutes; but that a different tribunal is created for their trial, which is guided by a different rule from that which governed previous to those statutes. Therefore, on an indictment for piracy, it is still necessary to prove an offence which was piracy before the statutes. He drew from these authorities a very different conclusion from that which had been drawn by his colleague. To show the correctness of his conclusion, it was necessary to observe, that the statute did not indeed change the nature of piracy, since it only transferred the trial of the crime to a different tribunal, where different rules of decision prevailed; but having done this, other crimes committed on the high seas, which were not piracy, were made punishable by the same tribunal; but certainly this municipal regulation could not be considered as proving that those offences were, before, piracy by the law of nations. [Mr. NICHOLAS insisted that the law was not correctly stated, whereupon Mr. MARSHALL called for 3 *Inst.* and read the statute:]

"All treasons, felonies, robberies, murders, and confederacies, committed in or upon the seas, &c., shall be inquired, tried, heard, determined and judged in such shires, &c., in like form and condition as if any such offence had been committed on the land," &c. "And such as shall be convicted, &c., shall have and suffer such pains of death, &c., as if they had been attainted of any treason, felony, robbery, or other the said offences done upon the land."

This statute, it is certain, does not change the nature of piracy; but all treasons, felonies, robberies, murders, and confederacies, committed in or upon the sea, are not declared to have been, nor are they piracies. If a man be indicted as a pirate, the offence must be shown to have been piracy before the statute; but if he be indicted for treason, felony, robbery, murder, or confederacy, committed at sea, whether such offence was or was not a piracy, he shall be punished in like manner as if he had committed the same offence on land. The passage cited from 1 *Woodeson*, 140, is a full authority to this point Having stated that offences committed at sea were formerly triable before the Lord High Admiral, according to the course of the Roman civil law, *Woodeson* says:

"But, by the statutes 27 H. 8. c. 4, and 28 H. 8. c. 15, all treasons, felonies, piracies and other crimes committed on the sea, or where the admiral has jurisdiction, shall be tried in the realm as if done on land. But the statutes referred to affect only the manner of the trial so far as respects piracy. The nature of the offence is not changed. Whether a charge amount to piracy or not, must still depend on the law of nations, except where, in the case of British subjects, express acts of Parliament have declared that the crimes therein specified shall be adjudged piracy, or shall be liable to the same mode of trial and degree of punishment."

This passage proves not only that all offences at sea are not piracies by the law of nations, but also that all indictments for piracy must depend on the law of nations, "except where, in the case of British subjects, express acts of Parliament" have changed the law. Why do not these "express acts of Parliament" change the law as to others than "British subjects?" The words are general, "all treasons, felonies, &c." Why are they confined in construction to British subjects? The answer is a plain one: The jurisdiction of the nation is confined to its territory and to its own subjects.

The gentleman from Pennsylvania (Mr. GALLATIN) abandons, and very properly abandons, this untenable ground. He admits that no nation has a right to punish offences against another nation, and that the United States can only punish offences against their own laws and the law of nations. He admits, too, that if there had only been a mutiny (and consequently if there had only been a murder) on board the Hermione, that the American courts could have taken no cognizance of the crime. Yet mutiny is punishable as piracy by the law of both nations. That gentleman contends that the act committed by Nash was piracy, according to the law of nations. He supports his position by insisting that the offence may be constituted by the commission of a single act; that unauthorized robbery on the high seas is this act, and that the crew having seized the vessel, and being out of the protection of any nation, were pirates.

It is true that the offence may be completed by a single act; but it depends on the nature of that act. If it be such as manifests generally hostility against the world—an intention to rob generally, then it is piracy; but if it be merely a mutiny and murder in a vessel, for the purpose of delivering it up to the enemy, it seems to be an offence against a single nation and not to be piracy. The sole object of the crew might be to go over to the enemy, or to free themselves from the tyranny experienced on board a ship-of-war, and not to rob generally.

But, should it even be true that running away with a vessel to deliver her up to an enemy was an act of general piracy, punishable by all nations, yet the mutiny and murder was a distinct offence. Had the attempt to seize the vessel failed, after the commission of the murder, then, according to the argument of the gentleman from Pennsylvania, the American courts could have taken no cognizance of the crime. Whatever then might have been the law respecting the piracy, of the murder there was no jurisdiction. For the murder, not the piracy, Nash was delivered up. Murder, and not piracy, is comprehended in the 27th article of the treaty between the two nations. Had he been tried then and acquitted on an indictment for the piracy, he must still have been delivered up for the murder, of which the court could have no jurisdiction. It is certain that an acquittal of the piracy would not have discharged the murder; and, therefore, in the so much relied on trials at Trenton, a separate indictment for murder was filed after an indictment for piracy. Since, then, if acquitted for piracy, he must have been delivered to the British Government on the charge of murder, the President of the United States might, very properly, without prosecuting for the piracy, direct him to be delivered up on the murder.

ADD-32

All the gentlemen who have spoken in support of the resolutions, have contended that the case of Thomas Nash is within the purview of the act of Congress, which relates to this subject, and is by that act made punishable in the American courts. That is, that the act of Congress designed to punish crimes committed on board a British frigate. Nothing can be more completely demonstrable than the untruth of this proposition.

It has already been shown that the legislative jurisdiction of a nation extends only to its own territory, and to its own citizens, wherever they may be. Any general expression in a legislative act must, necessarily, be restrained to objects within the jurisdiction of the Legislature passing the act. Of consequence an act of Congress can only be construed to apply to the territory of the United States, comprehending every person within it, and to the citizens of the United States.

But, independent of this undeniable truth, the act itself affords complete testimony of its intention and extent. (See *Laws of the United States*, vol. i. p. 10.) The title is: "An act for the punishment of certain crimes against the United States." Not against Britain, France, or the world, but singly "against the United States."

The first section relates to treason, and its objects are, "any person or persons owing allegiance to the United States." This description comprehends only the citizens of the United States, and such others as may be on its territory or in its service.

The second section relates to misprision of treason; and declares, without limitation, that any person or persons, having knowledge of any treason, and not communicating the same, shall be guilty of that crime. Here then is an instance of that limited description of persons in one section, and of that general description in another, which has been relied on to support the construction contended for by the friends of the resolutions. But will it be pretended that a person can commit misprision of treason who cannot commit treason itself? That he would be punishable for concealing a treason who could not be punished for plotting it? Or, can it be supposed that the act designed to punish an Englishman or a Frenchman, who, residing in his own country, should have knowledge of treasons against the United States, and should not cross the Atlantic to reveal them?

The same observations apply to the sixth section, which makes any "person or persons" guilty of misprision of felony, who, having knowledge of murder or other offences enumerated in that section, should conceal them. It is impossible to apply this to a foreigner, in a foreign land, or to any person not owing allegiance to the United States.

The eighth section, which is supposed to comprehend the case, after declaring that if any "person or persons" shall commit murder on the high seas, he shall be punishable with death, proceeds to say, that if any captain or mariner shall piratically run away with a ship or vessel, or yield her up voluntarily to a pirate, or if any seaman shall lay violent hands on his commander, to prevent his fighting, or shall make a revolt in the ship, every such offender shall be adjudged a pirate and a felon.

The persons who are the objects of this section of the act are all described in general terms, which might embrace the subjects of all nations. But is it to be supposed that, if in an engagement between an English and a French ship-of-war, the crew of the one or the other should lay violent hands on the captain and force him to strike, that this would be an offence against the act of Congress, punishable in the courts of the United States? On this extended construction of the general terms of the section, not only the crew of one of the foreign vessels forcing their captain to surrender to another, would incur the penalties of the act, but, if in the late action between the gallant Truxtun and the French frigate, the crew of that frigate had compelled the captain to surrender, while he was unwilling to do so, they would have been indictable as felons in the courts of the United States. But surely the act of Congress admits of no such extravagant construction.

His colleague, Mr. M. said, had cited and particularly relied on the ninth section of the act; that section declares, that if a citizen shall commit any of the enumerated piracies, or any acts of hostility, on the high seas, against the United States, under color of a commission from any foreign Prince or State, he shall be adjudged a pirate, felon, and robber, and shall suffer death.

This section is only a positive extension of the act to a case which might otherwise have escaped punishment. It takes away the protection of a foreign commission from an American citizen, who, on the high seas, robs his countrymen. This is no exception from any preceding part of the law, because there is no part which relates to the conduct of vessels commissioned by a foreign Power; it only proves that, in the opinion of the Legislature, the penalties of the act could not, without this express provision, have been incurred by a citizen holding a foreign commission.

It is most certain, then, that the act of Congress does not comprehend the case of a murder committed on board a foreign ship-of-war.

The gentleman from New York has cited 2 *Woodeson*, 428, to show that the courts of England extend their jurisdiction to piracies committed by the subjects of foreign nations.

This has not been doubted. The case from Woodeson is a case of robberies committed on the high seas by a vessel without authority. There are ordinary acts of piracy which, as has been already stated, being offences against all nations, are punishable by all. The case from 2 *Woodeson*, and the note cited from the same book by the gentleman from Delaware, are strong authorities against the doctrines contended for by the friends of the resolutions.

It has also been contended that the question of jurisdiction was decided at Trenton, by receiving indictments against persons there arraigned for the same offence, and by retaining them for trial after the return of the habeas corpus.

Every person in the slightest degree acquainted

ADD-33

with judicial proceedings, knows that an indictment is no evidence of jurisdiction; and that, in criminal cases, the question of jurisdiction will seldom be made but by arrest of judgment after conviction.

The proceedings, after the return of the habeas corpus, only prove that the case was not such a case as to induce the Judge immediately to decide against his jurisdiction. The question was not free from doubt, and, therefore, might very properly be postponed until its decision should become necessary.

It has been argued by the gentleman from New York, that the form of the indictment is, itself, evidence of a power in the court to try the case. Every word of that indictment, said the gentleman, gives the lie to a denial of the jurisdiction of the court.

It would he assuming a very extraordinary principle, indeed, to say that words inserted in an indictment for the express purpose of assuming the jurisdiction of a court, should be admitted to prove that jurisdiction. The question certainly depended on the nature of the fact, and not on the description of the fact. But as an indictment must necessarily contain formal words in order to be supported, and as forms often denote what a case must substantially be to authorize a court to take cognizance of it, some words in the indictments at Trenton ought to be noticed. The indictments charge the persons to have been within the peace, and murder to have been committed against the peace, of the United States. These are necessary averments, and, to give the court jurisdiction, the fact ought to have accorded with them. But who will say that the crew of a British frigate on the high seas, are within the peace of the United States? or a murder committed on board such a frigate, against the peace of any other than the British Government?

It is, then, demonstrated that the murder with which Thomas Nash was charged, was not committed within the jurisdiction of the United States, and, consequently, that the case stated was completely within the letter and the spirit of the twenty-seventh article of the treaty between the two nations. If the necessary evidence was produced, he ought to have been delivered up to justice. It was an act to which the American nation was bound by a most solemn compact. To have tried him for the murder would have been mere mockery. To have condemned and executed him, the court having no jurisdiction, would have been murder. To have acquitted and discharged him would have been a breach of faith, and a violation of national duty.

But it has been contended that, although Thomas Nash ought to have been delivered up to the British Minister, on the requisition made by him in the name of his Government, yet, the interference of the President was improper.

This, Mr. M. said, led to his second proposition, which was:

That the case was a case for Executive and not Judicial decision. He admitted implicitly the division of powers, stated by the gentleman from New York, and that it was the duty of each department to resist the encroachments of the others.

This being established, the inquiry was, to what department was the power in question allotted?

The gentleman from New York had relied on the second section of the third article of the Constitution, which enumerates the cases to which the Judicial power of the United States extends, as expressly including that now under consideration. Before he examined that section, it would not be improper to notice a very material misstatement of it made in the resolutions, offered by the gentleman from New York. By the Constitution, the Judicial power of the United States is extended to all cases in law and equity, arising under the Constitution, laws, and treaties of the United States; but the resolutions declare that Judicial power to extend to all questions arising under the Constitution, treaties, and laws of the United States. The difference between the Constitution and the resolutions was material and apparent. A case in law or equity was a term well understood, and of limited signification. It was a controversy between parties which had taken a shape for judicial decision. If the Judicial power extended to every question under the Constitution, it would involve almost every subject proper for Legislative discussion and decision; if, to every question under the laws and treaties of the United States, it would involve almost every subject on which the Executive could act. The division of power which the gentleman had stated, could exist no longer, and the other departments would be swallowed up by the Judiciary. But it was apparent that the resolutions had essentially misrepresented the Constitution. He did not charge the gentleman from New York with intentional misrepresentation; he would not attribute to him such an artifice in any case, much less in a case where detection was so easy and so certain. Yet this substantial departure from the Constitution, in resolutions affecting substantially to unite it, was not less worthy of remark for being unintentional. It manifested the course of reasoning by which the gentleman had himself been misled, and his judgment betrayed into the opinions those resolutions expressed. By extending the Judicial power to all cases in law and equity, the Constitution had never been understood to confer on that department any political power whatever. To come within this description, a question must assume a legal form for forensic litigation and judicial decision. There must be parties to come into court, who can be reached by its process, and bound by its power; whose rights admit of ultimate decision by a tribunal to which they are bound to submit.

A case in law or equity proper for judicial decision may arise under a treaty, where the rights of individuals acquired or secured by a treaty are to be asserted or defended in court. As under the fourth or sixth article of the Treaty of Peace with Great Britain, or under those articles of our late treaties with France, Prussia, and other nations, which secure to the subjects of those nations

their property within the United States; or, as would be an article, which, instead of stipulating to deliver up an offender, should stipulate his punishment, provided the case was punishable by the laws and in the courts of the United States. But the Judicial power cannot extend to political compacts; as the establishment of the boundary line between the American and British dominions; the case of the late guarantee in our Treaty with France, or the case of the delivery of a murderer under the twenty-seventh article of our present Treaty with Britain.

The gentleman from New York has asked, triumphantly asked, what power exists in our courts to deliver up an individual to a foreign Government? Permit me, said Mr. M., but not triumphantly, to retort the question. By what authority can any court render such a judgment? What power does a court possess to seize any individual and determine that he shall be adjudged by a foreign tribunal? Surely our courts possess no such power, yet they must possess it, if this article of the treaty is to be executed by the courts.

Gentlemen have cited and relied on that clause in the Constitution, which enables Congress to define and punish piracies and felonies committed on the high seas, and offences against the law of nations; together with an act of Congress, declaring the punishment of those offences; as transferring the whole subject to the courts. But that clause can never be construed to make to the Government a grant of power, which the people making it do not themselves possess. It has already been shown that the people of the United States have no jurisdiction over offences committed on board a foreign ship against a foreign nation. Of consequence, in framing a Government for themselves, they cannot have passed this jurisdiction to that Government. The law, therefore, cannot act upon the case. But this clause of the Constitution cannot be considered, and need not be considered, as affecting acts which are piracy under the law of nations. As the judicial power of the United States extends to all cases of admiralty and maritime jurisdiction, and piracy under the law of nations is of admiralty and maritime jurisdiction, punishable by every nation, the judicial power of the United States of course extends to it. On this principle the Courts of Admiralty under the Confederation took cognizance of piracy, although there was no express power in Congress to define and punish the offence.

But the extension of judicial power of the United States to all cases of admiralty and maritime jurisdiction must necessarily be understood with some limitation. All cases of admiralty and maritime jurisdiction which, from their nature, are triable in the United States, are submitted to the jurisdiction of the courts of the United States.

There are cases of piracy by the law of nations, and cases within the legislative jurisdiction of the nation; the people of America possessed no other power over the subject, and could consequently transfer no other to their courts; and it has already been proved that a murder committed on board a foreign ship-of-war is not comprehended within this description.

The Consular Convention with France, has also been relied on, as proving the act of delivering up an individual to a foreign Power to be in its nature Judicial and not Executive.

The ninth article of that Convention authorizes the Consuls and Vice Consuls of either nation to cause to be arrested all deserters from their vessels, "for which purpose the said Consuls and Vice 'Consuls shall address themselves to the courts, 'judges, and officers competent."

This article of the Convention does not, like the 27th article of the Treaty with Britain, stipulate a national act, to be performed on the demand of a nation; it only authorizes a foreign Minister to cause an act to be done, and prescribes the course he is to pursue. The contract itself is, that the act shall be performed by the agency of the foreign Consul, through the medium of the courts; but this affords no evidence that a contract of a very different nature is to be performed in the same manner.

It is said that the then President of the United States declared the incompetency of the courts, judges, and officers, to execute this contract without an act of the Legislature. But the then President made no such declaration.

He has said that some legislative provision is requisite to carry the stipulations of the Convention into full effect. This, however, is by no means declaring the incompetency of a department to perform an act stipulated by treaty, until the legislative authority shall direct its performance.

It has been contended that the conduct of the Executive on former occasions, similar to this in principle, has been such as to evince an opinion, even in that department, that the case in question is proper for the decision of the courts.

The fact adduced to support this argument is the determination of the late President on the case of prizes made within the jurisdiction of the United States, or by privateers fitted out in their ports.

The nation was bound to deliver up those prizes in like manner, as the nation is now bound to deliver up an individual demanded under the 27th article of the Treaty with Britain. The duty was the same, and devolved on the same department.

In quoting the decision of the Executive on that case, the gentleman from New York has taken occasion to bestow a high encomium on the late President; and to consider his conduct as furnishing an example worthy the imitation of his successor. It must be the cause of much delight to the real friends of that great man; to those who supported his Administration while in office from a conviction of its wisdom and its virtue, to hear the unqualified praise which is now bestowed on it by those who had been supposed to possess different opinions. If the measure now under consideration shall be found, on examination, to be the same in principle with that which has been cited, by its opponents, as a fit precedent for it, then may the friends of the gentleman now in office indulge the hope, that when he, like his predecessor, shall be

ADD-35

no more, his conduct too may be quoted as an example for the government of his successors.

The evidence relied on to prove the opinion of the then Executive on the case, consists of two letters from the Secretary of State, the one of the 29th of June, 1793, to Mr. Genet, and the other of the 16th of August, 1793, to Mr. Morris.

In the letter to Mr. Genet, the Secretary says, that the claimant having filed his libel against the ship William, in the Court of Admiralty, there was no power which could take the vessel out of court until it had decided against its own jurisdiction; that having so decided, the complaint is lodged with the Executive, and he asks for evidence, to enable that department to consider and decide finally on the subject.

It will be difficult to find in this letter an Executive opinion, that the case was not a case for Executive decision. The contrary is clearly avowed. It is true, that when an individual, claiming the property as his, had asserted that claim in court, the Executive acknowledges in itself a want of power to dismiss or decide upon the claim thus pending in court. But this argues no opinion of a want of power in itself to decide upon the case, if, instead of being carried before a court as an individual claim, it is brought before the Executive as a national demand. A private suit instituted by an individual, asserting his claim to property, can only be controlled by that individual. The Executive can give no direction concerning it. But a public prosecution carried on in the name of the United States can, without impropriety, be dismissed at the will of the Government. The opinion, therefore, given in this letter, is unquestionably correct; but it is certainly misunderstood, when it is considered as being an opinion that the question was not in its nature a question for Executive decision.

In the letter to Mr. Morris, the Secretary asserts the principle, that vessels taken within our jurisdiction ought to be restored, but says, it is yet unsettled whether the act of restoration is to be performed by the Executive or Judicial department. The principles, then, according to this letter, is not submitted to the courts—whether a vessel captured within a given distance of the American coast, was or was not captured within the jurisdiction of the United States, was a question not to be determined by the courts, but by the Executive. The doubt expressed is not what tribunal shall settle the principle, but what tribunal shall settle the fact. In this respect, a doubt might exist in the case of prizes, which could not exist in the case of a man. Individuals on each side claimed the property, and therefore their rights could be brought into court, and there contested as a case in law or equity. The demand of a man made by a nation stands on different principles.

Having noticed the particular letters cited by the gentleman from New York, permit me now, said Mr. M., to ask the attention of the House to the whole course of Executive conduct on this interesting subject.

It is first mentioned in a letter from the Secretary of State to Mr. Genet, of the 25th of June, 1793. In that letter, the Secretary states a consultation between himself and the Secretaries of the Treasury and War, (the President being absent,) in which (so well were they assured of the President's way of thinking in those cases,) it was determined that the vessels should be detained in the custody of the Consuls, in the ports, until the Government of the United States shall be able to inquire into and decide on the fact.

In his letter of the 12th of July, 1793, the Secretary writes, the President has determined to refer the questions concerning prizes "to persons learned in the laws," and he requests that certain vessels enumerated in the letter should not depart "until his ultimate determination shall be made known."

In his letter of the 7th of August, 1793, the Secretary informs Mr. Genet that the President considers the United States as bound "to effectuate 'the restoration of, or to make compensation for, 'prizes which shall have been made of any of the 'parties at war with France, subsequent to the 5th 'day of June last, by privateers fitted out of our 'ports." That it is consequently expected that Mr. Genet will cause restitution of such prizes to be made, and that the United States "will cause restitution" to be made "of all such prizes as shall be 'hereafter brought within their ports by any of the 'said privateers."

In his letter of the 10th of November, 1793, the Secretary informs Mr. Genet, that for the purpose of obtaining testimony to ascertain the fact of capture within the jurisdiction of the United States, the Governors of the several States were requested, on receiving any such claim, immediately to notify thereof the Attorneys of their several districts, whose duty it would be to give notice "to the 'principal agent of both parties, and also to the 'Consuls of the nations interested; and to recommend to them to appoint by mutual consent arbiters to decide whether the capture was made within the jurisdiction of the United States, as stated in 'my letter of the 8th inst., according to whose award 'the Governor may proceed to deliver the vessel 'to the one or the other party." "If either party 'refuse to name arbiters, then the Attorney is to 'take depositions on notice, which he is to transmit for the information and decision of the President." "This prompt procedure is the more to 'be insisted on, as it will enable the President, by 'an immediate delivery of the vessel and cargo 'to the party having title, to prevent the injuries 'consequent on long delay."

In his letter of the 22d of November, 1793, the Secretary repeats, in substance, his letter of the 12th of July and 7th of August, and says that the determination to deliver up certain vessels, involved the brig Jane, of Dublin, the brig Lovely Lass, and the brig Prince William Henry. He concludes with saying: "I have it in charge to 'inquire of you, sir, whether these three brigs have 'been given up according to the determination of 'the President, and if they have not, to repeat the 'requisition that they may be given up to their 'former owners."

Ultimately it was settled that the fact should be investigated in the courts, but the decision was re-



ADD-36

gulated by the principles established by the Executive Department.

The decision, then, on the case of vessels captured within the American jurisdiction, by privateers fitted out of the American ports, which the gentleman from New York has cited with such merited approbation; which he has declared to stand on the same principles with those which ought to have governed the case of Thomas Nash; and which deserves the more respect, because the Government of the United States was then so circumstanced as to assure us that no opinion was lightly taken up, and no resolution formed but on mature consideration; this decision, quoted as a precedent and pronounced to be right, is found, on fair and full examination, to be precisely and unequivocally the same with that which was made in the case under consideration. It is a full authority to show that, in the opinion always held by the American Government, a case like that of Thomas Nash is a case for Executive and not Judicial decision.

The clause in the Constitution which declares that "the trial of all crimes, except in cases of impeachment, shall be by jury," has also been relied on as operating on the case, and transferring the decision on a demand for the delivery of an individual from the Executive to the Judicial department.

But certainly this clause in the Constitution of the United States cannot be thought obligatory on, and for the benefit of, the whole world. It is not designed to secure the rights of the people of Europe and Asia, or to direct and control proceedings against criminals throughout the universe. It can then be designed only to guide the proceedings of our own courts, and to prescribe the mode of punishing offences committed against the Government of the United States, and to which the jurisdiction of the nation may rightfully extend.

It has already been shown that the courts of the United States were incapable of trying the crime for which Thomas Nash was delivered up to justice. The question to be determined was, not how his crime should be tried and punished, but whether he should be delivered up to a foreign tribunal, which was alone capable of trying and punishing him. A provision for the trial of crimes in the courts of the United States is clearly not a provision for the performance of a national compact for the surrender to a foreign Government of an offender against that Government.

The clause of the Constitution declaring that the trial of all crimes shall be by jury, has never even been construed to extend to the trial of crimes committed in the land and naval forces of the United States. Had such a construction prevailed, it would most probably have prostrated the Constitution itself, with the liberties and the independence of the nation, before the first disciplined invader who should approach our shores. Necessity would have imperiously demanded the review and amendment of so unwise a provision. If, then, this clause does not extend to offences committed in the fleets and armies of the United States, how can it be construed to extend to offences committed in the fleets and armies of Britain or of France, or of the Ottoman or Russian Empires?

The same argument applies to the observations on the seventh article of the amendments to the Constitution. That article relates only to trials in the courts of the United States, and not to the performance of a contract for the delivery of a murderer not triable in those courts.

In this part of the argument, the gentleman from New York has presented a dilemma, of a very wonderful structure indeed. He says that the offence of Thomas Nash was either a crime or not a crime. If it was a crime, the Constitutional mode of punishment ought to have been observed; if it was not a crime, he ought not to have been delivered up to a foreign Government, where his punishment was inevitable.

It had escaped the observation of that gentleman, that if the murder committed by Thomas Nash was a crime, yet it was not a crime provided for by the Constitution, or triable in the courts of the United States; and that if it was not a crime, yet it is the precise case in which his surrender was stipulated by treaty. Of this extraordinary dilemma, then, the gentleman from New York is, himself, perfectly at liberty to retain either horn. He has chosen to consider it as a crime, and says it has been made a crime by treaty, and is punished by sending the offender out of the country.

The gentleman is incorrect in every part of his statement. Murder on board a British frigate is not a crime created by treaty. It would have been a crime of precisely the same magnitude had the treaty never been formed. It is not punished by sending the offender out of the United States. The experience of this unfortunate criminal, who was hung and gibbeted, evinced to him that the punishment of his crime was of a much more serious nature than mere banishment from the United States.

The gentleman from Pennsylvania and the gentleman from Virginia have both contended that this was a case proper for the decision of the courts, because points of law occurred, and points of law must have been decided in its determination.

The points of law which must have been decided, are stated by the gentleman from Pennsylvania to be, first, a question whether the offence was committed within the British jurisdiction; and, secondly, whether the crime charged was comprehended within the treaty.

It is true, sir, these points of law must have occurred, and must have been decided; but it by no means follows that they could only have been decided in court. A variety of legal questions must present themselves in the performance of every part of Executive duty, but these questions are not therefore to be decided in court. Whether a patent for land shall issue or not is always a question of law, but not a question which must necessarily be carried into court. The gentleman from Pennsylvania seems to have permitted himself to have been misled by the misrepresentation of the

ADD-37

Constitution made in the resolutions of the gentleman from New York; and, in consequence of being so misled, his observations have the appearance of endeavoring to fit the Constitution to his arguments, instead of adapting his arguments to the Constitution.

When the gentleman has proved that these are questions of law, and that they must have been decided by the President, he has not advanced a single step towards proving that they were improper for Executive decision. The question whether vessels captured within three miles of the American coast, or by privateers fitted out in the American ports, were legally captured or not, and whether the American Government was bound to restore them, if in its power, were questions of law; but they were questions of political law, proper to be decided, and they were decided by the Executive, and not by the courts.

The *casus fœderis* of the guaranty was a question of law, but no man could have hazarded the opinion that such a question must be carried into court, and can only be there decided. So the *casus fœderis*, under the twenty-seventh article of the treaty with Great Britain, is a question of law, but of political law. The question to be decided is, whether the particular case proposed be one in which the nation has bound itself to act, and this is a question depending on principles never submitted to courts.

If a murder should be committed within the United States, and the murderer should seek an asylum in Britain, the question whether the *casus fœderis* of the twenty-seventh article had occurred, so that his delivery ought to be demanded, would be a question of law, but no man would say it was a question which ought to be decided in the courts.

When, therefore, the gentleman from Pennsylvania has established, that in delivering up Thomas Nash, points of law were decided by the President, he has established a position which in no degree whatever aids his argument.

The case was in its nature a national demand made upon the nation. The parties were the two nations. They cannot come into court to litigate their claims, nor can a court decide on them. Of consequence, the demand is not a case for judicial cognizance.

The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations. Of consequence, the demand of a foreign nation can only be made on him.

He possesses the whole Executive power. He holds and directs the force of the nation. Of consequence, any act to be performed by the force of the nation is to be performed through him.

He is charged to execute the laws. A treaty is declared to be a law. He must then execute a treaty, where he, and he alone, possesses the means of executing it.

The treaty, which is a law, enjoins the performance of a particular object. The person who is to perform this object is marked out by the Constitution, since the person is named who conducts the foreign intercourse, and is to take care that the laws be faithfully executed. The means by which it is to be performed, the force of the nation, are in the hands of this person. Ought not this person to perform the object, although the particular mode of using the means has not been prescribed? Congress, unquestionably, may prescribe the mode, and Congress may devolve on others the whole execution of the contract; but, till this be done, it seems the duty of the Executive department to execute the contract by any means it possesses.

The gentleman from Pennsylvania contends that, although this should be properly an Executive duty, yet it cannot be performed until Congress shall direct the mode of performance. He says that, although the jurisdiction of the courts is extended by the Constitution to all cases of admiralty and maritime jurisdiction, yet if the courts had been created without any express assignment of jurisdiction, they could not have taken cognizance of cases expressly allotted to them by the Constitution. The Executive, he says, can, no more than courts, supply a legislative omission.

It is not admitted that, in the case stated, courts could not have taken jurisdiction. The contrary is believed to have been the correct opinion. And although the Executive cannot supply a total Legislative omission, yet it is not admitted or believed that there is such a total omission in this case.

The treaty, stipulating that a murderer shall be delivered up to justice, is as obligatory as an act of Congress making the same declaration. If, then, there was an act of Congress in the words of the treaty, declaring that a person who had committed murder within the jurisdiction of Britain, and sought an asylum within the territory of the United States, should be delivered up by the United States, on the demand of His Britannic Majesty, and such evidence of his criminality, as would have justified his commitment for trial, had the offence been here committed; could the President, who is bound to execute the laws, have justified the refusal to deliver up the criminal, by saying, that the Legislature had totally omitted to provide for the case?

The Executive is not only the Constitutional department, but seems to be the proper department to which the power in question may most wisely and most safely be confided.

The department which is entrusted with the whole foreign intercourse of the nation, with the negotiation of all its treaties, with the power of demanding a reciprocal performance of the article, which is accountable to the nation for the violation of its engagements with foreign nations, and for the consequences resulting from such violation, seems the proper department to be entrusted with the execution of a national contract like that under consideration.

If, at any time, policy may temper the strict execution of the contract, where may that political discretion be placed so safely as in the department whose duty it is to understand precisely the

state of the political intercourse and connexion between the United States and foreign nations, to understand the manner in which the particular stipulation is explained and performed by foreign nations, and to understand completely the state of the Union?

This department, too, independent of judicial aid, which may, perhaps, in some instances, be called in, is furnished with a great law officer, whose duty it is to understand and to advise when the *casus fœderis* occurs. And if the President should cause to be arrested under the treaty an individual who was so circumstanced as not to be properly the object of such an arrest, he may perhaps bring the question of the legality of his arrest before a judge, by a writ of habeas corpus.

It is then demonstrated, that, according to the principles of the American Government, the question whether the nation has or has not bound itself to deliver up any individual, charged with having committed murder or forgery within the jurisdiction of Britain, is a question the power to decide which rests alone with the Executive department.

It remains to inquire whether, in exercising this power, and in performing the duty it enjoins, the President has committed an unauthorized and dangerous interference with judicial decisions.

That Thomas Nash was committed originally at the instance of the British Consul at Charleston, not for trial in the American courts, but for the purpose of being delivered up to justice in conformity with the treaty between the two nations, has been already so ably argued by the gentleman from Delaware, that nothing further can be added to that point. He would, therefore, Mr. Marshall said, consider the case as if Nash, instead of having been committed for trial. Admitting even this to have been the fact, the conclusions which have been drawn from it were by no means warranted.

Gentlemen had considered it as an offence against judicial authority, and a violation of judicial rights to withdraw from their sentence a criminal against whom a prosecution had been commenced. They had treated the subject as if it was the privilege of courts to condemn to death the guilty wretch arraigned at their bar, and that to intercept the judgment was to violate the privilege. Nothing can be more incorrect than this view of the case. It is not the privilege, it is the sad duty of courts to administer criminal judgment. It is a duty to be performed at the demand of the nation, and with which the nation has a right to dispense. If judgment of death is to be pronounced, it must be at the prosecution of the nation, and the nation may at will stop that prosecution. In this respect the President expresses constitutionally the will of the nation; and may rightfully, as was done in the case at Trenton, enter a *nolle prosequi*, or direct that the criminal be prosecuted no farther. This is no interference with judicial decisions, nor any invasion of the province of a court. It is the exercise of an indubitable and a Constitutional power. Had the President directed the Judge at Charleston to decide for or against his own jurisdiction, to condemn or acquit the prisoner, this would have been a dangerous interference with judicial decisions, and ought to have been resisted. But no such direction has been given, nor any such decision been required. If the President determined that Thomas Nash ought to have been delivered up to the British Government for a murder committed on board a British frigate, provided evidence of the fact was adduced, it was a question which duty obliged him to determine, and which he determined rightly. If, in consequence of this determination, he arrested the proceedings of a court on a national prosecution, he had a right to arrest and to stop them, and the exercise of this right was a necessary consequence of the determination of the principal question. In conforming to this decision, the court has left open the question of its jurisdiction. Should another prosecution of the same sort be commenced, which should not be suspended but continued by the Executive, the case of Thomas Nash would not bind as a precedent against the jurisdiction of the court. If it should even prove that, in the opinion of the Executive, a murder committed on board a foreign fleet was not within the jurisdiction of the court, it would prove nothing more; and though this opinion might rightfully induce the Executive to exercise its power over the prosecution, yet if the prosecution was continued, it would have no influence with the court in deciding on its jurisdiction.

Taking the fact, then, even to be as the gentlemen in support of the resolutions would state it, the fact cannot avail them.

It is to be remembered, too, that in the case stated to the President, the Judge himself appears to have considered it as proper for Executive decision, and to have wished that decision. The President and Judge seem to have entertained, on this subject, the same opinion, and in consequence of the opinion of the Judge, the application was made to the President.

It has then been demonstrated—

1st. That the case of Thomas Nash, as stated to the President, was completely within the twenty-seventh article of the treaty between the United States and Great Britain.

2d. That this question was proper for Executive, and not for Judicial decision; and,

3d. That in deciding it, the President is not chargeable with an interference with Judicial decisions.

After trespassing so long, Mr. Marshall said, on the patience of the House, in arguing what had appeared to him to be the material points growing out of the resolutions, he regretted the necessity of detaining them still longer for the purpose of noticing an observation which appeared not to be considered by the gentleman who made it as belonging to the argument.

The subject introduced by this observation, however, was so calculated to interest the public feelings, that he must be excused for stating his opinion on it.

The gentleman from Pennsylvania had said that an impressed American seaman, who should

ADD-39

commit homicide for the purpose of liberating himself from the vessel in which he was confined, ought not to be given up as a murderer. In this, Mr. M. said, he concurred entirely with that gentleman. He believed the opinion to be unquestionably correct, as were the reasons that gentleman had given in support of it. He had never heard any American avow a contrary sentiment, nor did he believe a contrary sentiment could find a place in the bosom of any American. He could not pretend, and did not pretend to know the opinion of the Executive on this subject, because he had never heard the opinions of that department; but he felt the most perfect conviction, founded on the general conduct of the Government, that it could never surrender an impressed American to the nation which, in making the impressment, had committed a national injury.

This belief was in no degree shaken by the conduct of the Executive in this particular case.

In his own mind, it was a sufficient defence of the President from an imputation of this kind, that the fact of Thomas Nash being an impressed American was obviously not contemplated by him in the decision he made on the principles of the case. Consequently, if a new circumstance occurred, which would essentially change the case decided by the President, the Judge ought not to have acted under that decision, but the new circumstance ought to have been stated. Satisfactory as this defence might appear, he should not resort to it, because to some it might seem a subterfuge. He defended the conduct of the President on other and still stronger ground.

The President had decided that a murder committed on board a British frigate on the high seas, was within the jurisdiction of that nation, and consequently within the twenty-seventh article of its treaty with the United States. He therefore directed Thomas Nash to be delivered to the British Minister, if satisfactory evidence of the murder should be adduced. The sufficiency of the evidence was submitted entirely to the Judge.

If Thomas Nash had committed a murder, the decision was that he should be surrendered to the British Minister; but if he had not committed a murder, he was not to be surrendered.

Had Thomas Nash been an impressed American, the homicide on board the Hermione would, most certainly, not have been a murder.

The act of impressing an American is an act of lawless violence. The confinement on board a vessel is a continuation of the violence, and an additional outrage. Death committed within the United States, in resisting such violence, would not have been murder, and the person giving the wound could not have been treated as a murderer. Thomas Nash was only to have been delivered up to justice on such evidence as, had the fact been committed within the United States, would have been sufficient to have induced his commitment and trial for murder. Of consequence, the decision of the President was so expressed as to exclude the case of an impressed American liberating himself by homicide. He concluded with observing, that he had already too long availed himself of the indulgence of the House to venture farther on that indulgence by recapitulating or reinforcing the arguments which had already been urged.

When Mr. MARSHALL had concluded, Mr. DANA rose and spoke against the resolutions.

An adjournment was then called for and carried—yeas 50, nays 48.

---

SATURDAY, March 8.

## CASE OF JONATHAN ROBBINS.

The House resumed the consideration of the report made on Thursday last, by the Committee of the whole House to whom was referred the Message of the President of the United States of the seventh ultimo, containing their disagreement to the motion referred to them on the twentieth ultimo; and the said motion being read, in the words following, to wit:

"*Resolved*, That it appears to this House that a person calling himself Jonathan Robbins, and claiming to be a citizen of the United States, impressed on board a British ship-of-war, was committed for trial in one of the Courts of the United States, for the alleged crime of piracy and murder committed on the high seas, on board the British frigate Hermione. That a requisition being, subsequent to such commitment, made by the British Minister to the Executive of the United States, for the delivery of the said person (under the name of Thomas Nash) as a fugitive under the twenty-seventh article of the treaty with Great Britain, the President of the United States did, by a letter written from the Department of State, to the Judge who committed the said person for trial, officially declare his opinion to the said Judge that he 'considered an offence committed on board a public ship of-war on the high seas, to have been committed within the jurisdiction of the nation to whom the ship belongs;' and, in consequence of such opinion and construction, did advise and request the said Judge to deliver up the person so claimed, to the agent of Great Britain who should appear to receive him—provided, only, that the stipulated evidence of his criminality should be produced. That, in compliance with such advice and request of the President of the United States, the said person, so committed for trial, was, by the Judge of the District Court of South Carolina, without any presentment or trial by jury, or any investigation of his claim to be a citizen of the United States, delivered up to an officer of his Britannic Majesty, and afterwards tried by a court martial and executed, on a charge of mutiny and murder.

"*Resolved*, That, inasmuch as the Constitution of the United States declares that the Judicial power shall extend to all questions arising under the Constitution, laws, and treaties of the United States, and to all cases of admiralty and maritime jurisdiction; and, also, that the trial of all crimes, except in cases of impeachment, shall be by jury, and such trial shall be held in the State where such crimes shall have been committed, but when not committed within any State, then at such place or places as Congress may by law have directed: And, inasmuch as it is directed by law 'that the offence of murder, committed on the high seas, shall be deemed piracy and murder, and that the trial of all crimes committed on the high seas, or in any place out of the jurisdiction of any particular State, shall be in the district where the offender is apprehended, or into which he

ADD-40

may be first brought:' Therefore, the several questions, whether the alleged crime of piracy and murder was committed within the exclusive jurisdiction of Great Britain; whether it comes within the purview of the said twenty-seventh article; and whether a person, stating that he was an American citizen, and had committed the act of which he was accused in attempting to regain his liberty from illegal imprisonment, ought to be delivered up without any investigation of his claim to citizenship, or inquiry into the facts alleged in his defence, are all matters exclusively of judicial inquiry, as arising from treaties, laws, constitutional provisions, and cases of admiralty and maritime jurisdiction:

"That the decision of those questions by the President of the United States, against the jurisdiction of the Courts of the United States, in a case where those courts had already assumed and exercised jurisdiction, and his advice and request to the Judge of the District Court that the person thus charged should be delivered up, provided only such evidence of his criminality should be produced as would justify his apprehension and commitment for trial, are a dangerous interference of the Executive with Judicial decisions; and that the compliance with such advice and request, on the part of the Judge of the District Court of South Carolina, is a sacrifice of the Constitutional independence of the Judicial power and exposes the administration thereof to suspicion and reproach."

Mr. Nicholas spoke in answer to Mr. Marshall.

The question was then taken that the House do agree with the Committee of the Whole in their disagreement to the same, and resolved in the affirmative—yeas 61, nays 35, as follows:

Yeas—Willis Alston, George Baer, Bailey Bartlett, James A. Bayard, John Bird, John Brown, William Cooper, William Craik, John Davenport, Franklin Davenport, Thomas T. Davis, John Dennis, George Dent, Joseph Dickson, William Edmond, Thomas Evans, Abiel Foster, Dwight Foster, Jonathan Freeman, Henry Glen, Samuel Goode, Chauncey Goodrich, Elizur Goodrich, William Gordon, Edwin Gray, Roger Griswold, William Barry Grove, Robert Goodloe Harper, Archibald Henderson, William H. Hill, James H. Imlay, James Jones, John Wilkes Kittera, Henry Lee, Silas Lee, Samuel Lyman, James Linn, John Marshall, Abraham Nott, Harrison G. Otis, Robert Page, Josiah Parker, Thomas Pinckney, Jonas Platt, Leven Powell, John Reed, John Rutledge, jun., Samuel Sewall, James Sheafe, William Shepard, Richard Dobbs Spaight, David Stone, Benjamin Taliaferro, George Thatcher, John Chew Thomas, Richard Thomas, Joseph B. Varnum, Peleg Wadsworth, Robert Waln, Lemuel Williams, and Henry Woods.

Nays—Theodorus Bailey, Phanuel Bishop, Robert Brown, Samuel J. Cabell, Gabriel Christie, Matthew Clay, John Condit, Joseph Eggleston, Lucas Elmendorf, John Fowler, Albert Gallatin, Andrew Gregg, John A. Hanna, Joseph Heister, David Holmes, George Jackson, Aaron Kitchell, Michael Leib, Matthew Lyon, Edward Livingston, Nathaniel Macon, Peter Muhlenberg, Anthony New, John Nicholas, Joseph H. Nicholson, John Randolph, John Smiley, John Smith, Samuel Smith, Thomas Sumter, John Thomson, Abram Trigg, John Trigg, Philip Van Cortlandt, and Robert Williams.

A motion was made to adjourn. Mr. Macon hoped the House would sit and decide the resolution proposed by the gentleman from Delaware, so as to have done with the business, and not to enter on another week with it; however, 54 rising for the adjournment, it was carried.

---

Monday, March 10.

The House went into Committee of the Whole on the bill for the relief of Campbell Smith, reported their agreement to the bill without amendment, and the bill was ordered to be read the third time to-morrow.

The House resolved itself into a Committee of the Whole on the report of the committee to whom was referred, on the thirteenth of January last, a petition of Cato West and others, inhabitants of the Mississippi Territory, complaining of the political system by which the said Territory is governed; and, after some time spent therein, the Committee rose and reported progress.

*Ordered*, That the Committee of the Whole House be discharged from the further consideration of the said report, and that the same be recommitted to Mr. Claiborne, Mr. Griswold, Mr. Henderson, Mr. Nott, and Mr. Bartlett.

On a motion made and seconded that the House do come to the following resolutions, to wit:

*Resolved*, That, from and after the organization of the Mississippi Territory, the Governor shall nominate, and, by and with the advice and consent of the Legislative Council, shall appoint, all officers, both civil and military, of the Territory, whose appointments are not particularly vested in Congress by the ordinance; provided, that the Governor shall have power to fill up all vacancies which may happen during the recess of the Legislative Council, by granting commissions, which shall expire at the end of their next session.

*Resolved*, That every bill which shall have passed the House of Representatives and the Legislative Council, shall, before it become a law, be presented to the Governor of the Territory: if he approve, he shall sign it; but, if not, he shall return it, with his objections, to that House in which it shall have originated, who shall enter the objections, at large, on their journals, and proceed to reconsider it. If, after such reconsideration, two-thirds of that House shall agree to pass the bill, it shall be sent, together with the objections, to the other House, by which it shall likewise be reconsidered; and if approved by two-thirds of that House, it shall become a law. If any bill shall not be returned by the Governor within six days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the General Assembly, by their adjournment, prevent its return; in which case, it shall not be a law.

*Resolved*, That every order, resolution, or vote, to which the concurrence of the Legislative Council and House of Representatives may be necessary, except on a question of adjournment, shall be presented to the Governor of the Territory, and, before the same shall take effect, shall be approved by him; or, being disapproved by him, shall be re-passed by two-thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill.

*Resolved*, That the General Assembly shall meet at least once in every year, and such meeting shall be on the —— day of ——, unless they shall, by law, appoint a different day: *Provided*, that the Governor shall have power, on extraordinary occasions, to convene both Houses of the General Assembly, or either of them.

Founders Online [Back to normal view]

# From Thomas Jefferson to Edmond Charles Genet, 17 June 1793

## To Edmond Charles Genet

Sir Philadelphia June[1] 17. 1793.

I shall now have the honor of answering your letter of the 8th[2] instant, and so much of that of the 14th. (both of which have been laid before the President) as relates to a vessel armed in the port of new York and about to depart from thence, but stopped by order of the Government; and here I beg leave to premise, that, the case supposed in your letter, of a vessel arming merely for her own defence, and to repel unjust aggressions, is not that in question, nor that on which I mean to answer, because, not having yet happened, as far as is known to the Government, I have no instructions on the subject. The case in question is that of a vessel armed, equipped, and manned, in a part of the united States, for the purpose of committing hostilities on nations at peace with the united States.

As soon as it was perceived that such enterprises would be attempted, orders to prevent them, were dispatched to all the States and ports of the Union. In consequence of these, the Governor of new York, receiving information that a Sloop, heretofore called the Polly, now the Republican, was fitting out, arming, and manning in the port of new York, for the express, and sole purpose of cruising against certain Nations, with whom we are at peace; that she had taken her guns and ammunition aboard and was on the point of departure, seized the vessel. That the Governor was not mistaken in the previous indications of her object, appears by the subsequent avowal of the citizen Hauterive, consul of France at that port, who, in a letter to the Governor, reclaims her as "Un vaisseau armé en guerre, et pret à mettre à la voile," and describes her object in these expressions "Cet usage etrange de la force publique contre les citoyens d'une nation amie qui se reunissent ici *pour aller defendre leurs freres*," &c. and again "Je requiers, monsieur, l'autorité dont vous etes revetu, pour faire rendre à des François, à des alliés &c. la liberté *de voler au secours de leur patrie*." This transaction being reported to the President, orders were immediately sent to deliver over the vessel, and the persons concerned in the enterprise to the tribunals of the Country, that if the act was of those forbidden by the law, it might be punished, if it was not forbidden, it might be so declared, and all persons apprised of what they might or might not do.

This we have reason to believe is the true state of the case, and it is a repetition of that which was the subject of my letter of the 5th. instant, which animadverted not merely on the single fact of the granting commissions of war, by one nation, within the territory of another; but on the aggregate of the facts: for it states the Opinion of the President to be "That the arming and equipping vessels in the ports of the United States, to cruise against nations with whom they are at peace, was incompatible with the sovereignty of the United States; that it made them instrumental to the annoyance of those nations, and thereby tended to compromit[3] their peace"—and this opinion is still conceived to be not contrary to the principles of natural law, the usage of nations, the engagements which unite the two people, nor the proclamation of the President, as you seem to think.

Surely not a syllable can be found in the last mentioned instrument, permitting the preparation of hostilities in the ports of the united States. It's object was to enjoin on our citizens "a friendly conduct towards all the belligerent powers," but a preparation of hostilities is the reverse of this.

None of the engagements in our treaties stipulate this permission. The XVIIth. article of that of commerce, permits the armed vessels of either party, to enter the ports of the other, and to depart with their prizes freely: but the entry of an armed vessel into a port, is one act; the equipping a vessel in that port, arming her, manning her, is a different one, and not engaged by any article of the Treaty.

You think, Sir, that this opinion is also contrary to the law of nature and usage of nations. We are of opinion it is dictated by that law and usage; and this had been very maturely enquired into before it was adopted as a principle of conduct. But we will not assume the exclusive right of saying what that law and usage is. Let us appeal to enlightened and disinterested Judges. None is more so than Vattel. He says L. 3. §. 104. "Tant qu'un peuple neutre veut jouïr surement de cet état, il doit montrer en toutes choses une exacte impartialité entre ceux qui se font la guerre. Car s'il favorise l'un au prejudice de l'autre,

il ne pourra pas se plaindre, quand celui-ci le traitera comme adhérent et associé de son ennemi. Sa neutralité seroit une neutralité frauduleuse, dont personne ne veut être la dupe.—Voyons donc en quoi consiste cette impartialité qu'un peuple neutre doit garder.

Elle se rapporte uniquement à la guerre, et comprend deux choses. 1°. Ne point donner de secours quand on n'y est pas obligé; ne fournir librement ni troupes, ni armes, ni munitions, ni rien de ce qui sert directement à la guerre. Je dis *ne point donner de secours*, et non pas *en donner egalement*; car il seroit absurde qu'un Etat secourût en même tems deux ennemis. Et puis il seroit impossible de le faire avec egalité; les mêmes choses, le même nombre de troupes, la même quantité d'armes, de munitions, &c. fournies en des circonstances differentes, ne forment plus des secours équivalens." &c. If the neutral power may not, consistent with it's neutrality, furnish men to either party, for their aid in war, as little can either enrol them in the neutral territory, by the law of nations. Wolf §. 1174. Says "Puisque le droit de lever des Soldats est un droit de majesté, qui ne peut être violé par une nation etrangere, il n'est pas permis de lever des soldats sur le territoire d'autrui, sans le consentement du maître du territoire." And Vattel, before cited L. 3. §. 15. "Le droit de lever des soldats appartenant uniquement à la nation, ou au souverain, personne ne peut en enroler en pays etranger sans la permission du souverain:—Ceux qui entreprennent d'engager des soldats en pays étranger sans la permission du Souverain, et en general quiconque débauche les sujets d'autrui, viole un des droits les plus sacrés du prince et de la nation. C'est le crime qu'on appelle *plagiat*, ou vol d'homme. Il n'est aucun Etat policé qui ne le punisse trés-sévérement." &c. For I chuse to refer you to the passage, rather than follow it thro' all its developments. The testimony of these, and other writers, on the law and usage of nations, with your own just reflections on them, will satisfy you that the united States in prohibiting all the belligerent powers from equipping, arming, and manning vessels of war in their ports, have exercised a right, and a duty with justice, and with great moderation. By our treaties with several of the belligerent powers, which are a part of the laws of our land, we have established a State of peace with them. But without appealing to treaties, we are at peace with them all by the law of nature. For by nature's law, man is at peace with man, till some aggression is committed, which, by the same law, authorizes one to destroy another as his enemy. For our citizens then, to commit murders and depredations on the members of nations at peace with us, to combine to do it, appeared to the Executive, and to those whom they consulted, as much against the laws of the land, as to murder or rob, or combine to murder or rob it's own citizens, and as much to require punishment, if done within their limits, where they have a territorial jurisdiction, or on the high seas, where they have a personal jurisdiction, that is to say, one which reaches their own citizens only, this being an appropriate part of each nation on an element where all have a common jurisdiction. So say our laws as we understand them ourselves. To them the appeal is made. And whether we have construed them well or ill, the constitutional Judges will decide. Till that decision shall be obtained, the Government of the United States must pursue what they think right with firmness, as is their duty. On the first attempt that was made the President was desirous of involving in the censures of the law, as few as might be. Such of the individuals only therefore as were citizens of the United States, were singled out for prosecution. But this second attempt being after full knowledge of what had been done on the first, and indicating a disposition to go on in opposition to the laws, they are to take their course against all persons concerned, whether Citizens, or aliens; the latter, while within our Jurisdiction and enjoying the protection of the laws, being bound to obedience to them, and to avoid disturbances of our peace within, or acts which would commit it without, equally as Citizens are. I have the honor to be, with sentiments of great respect & esteem, Sir, Your most obedient and most humble servant

---

PrC (DLC); in the hand of George Taylor, Jr., unsigned; with dateline completed in ink by Taylor (see note 1 below) and a clerical correction in ink by TJ; at foot of first page: "M. Genet, minister plenipoy. of the Repub. of France." PrC of Tr (DLC); in a clerk's hand. Tr (NNC: Gouverneur Morris Papers). Tr (DNA: RG 46, Senate Records, 3d Cong., 1st sess.). PrC (PRO: FO 97/1). FC (Lb in DNA: RG 59, DL). Tr (DLC: Genet Papers). Tr (AMAE: CPEU, . xxv[illegible]); in French. Tr (DLC: Genet Papers); in French; draft translation of preceding Tr, with revisions and docketing by Genet. Printed in *Message*, 28–30. Enclosed in TJ to Gouverneur Morris, 16 Aug. 1793.

Before sending this letter to Genet, TJ first secured presidential and Cabinet approval of it this day (Cabinet Opinion on French Privateers, 17 June 1793). For the **. RDERS ... DISPATCHED TO ALL THE STATES**, see TJ to Henry Knox, with Proposed Circular to the Governors of the States, 21 May 1793, and note. The **AVOWAL OF THE CITIZEN HAUTERIVE** is in Enclosure No. 2 at George Washington to TJ, 11 June 1793.

1. Remainder of dateline inserted in ink.

ADD-43

2. PrC: "18th." The Trs in NNC, PRO, AMAE, and the Genet Papers in DLC correctly give the date as "8"; all other texts follow the PrC.

3. Supplied from TJ to Genet, 5 June 1793. PrC and all other English texts: "commit." French texts: "compromettent."

*Note:* The annotations to this document, and any other modern editorial content, are copyright © Princeton University Press. All rights reserved.

| | |
|---|---|
| SOURCE PROJECT | Jefferson Papers |
| TITLE | From Thomas Jefferson to Edmond Charles Genet, 17 June 1793 |
| AUTHOR | Jefferson, Thomas |
| RECIPIENT | Genet, Edmond Charles |
| DATE | 17 June 1793 |
| CITE AS | "From Thomas Jefferson to Edmond Charles Genet, 17 June 1793," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-26-02-0276. [Original source: *The Papers of Thomas Jefferson*, vol. 26, *11 May–31 August 1793*, ed. John Catanzariti. Princeton: Princeton University Press, 1995, pp. 297–300.] |

The National Historical Publications and Records Commission (NHPRC) is part of the National Archives. Through its grants program, the NHPRC supports a wide range of activities to preserve, publish, and encourage the use of documentary sources, relating to the history of the United States, and research and development projects to bring historical records to the public.

## Special Message to Congress on the Foreign Policy Crisis -- War Message (June 1, 1812)

### James Madison

### Transcript

To the Senate and House of Representatives of the United States:

I communicate to Congress certain documents, being a continuation of those heretofore laid before them on the subject of our affairs with Great Britain.

Without going back beyond the renewal in 1803 of the war in which Great Britain is engaged, and omitting unrepaired wrongs of inferior magnitude, the conduct of her Government presents a series of acts hostile to the United States as an independent and neutral nation.

British cruisers have been in the continued practice of violating the American flag on the great highway of nations, and of seizing and carrying off persons sailing under it, not in the exercise of a belligerent right founded on the law of nations against an enemy, but of a municipal prerogative over British subjects. British jurisdiction is thus extended to neutral vessels in a situation where no laws can operate but the law of nations and the laws of the country to which the vessels belong, and a self-redress is assumed which, if British subjects were wrongfully detained and alone concerned, is that substitution of force for a resort to the responsible sovereign which falls within the definition of war. Could the seizure of British subjects in such cases be regarded as within the exercise of a belligerent right, the acknowledged laws of war, which forbid an article of captured property to be adjudged without a regular investigation before a competent tribunal, would imperiously demand the fairest trial where the sacred rights of persons were at issue. In place of such a trial these rights are subjected to the will of every petty commander.

The practice, hence, is so far from affecting British subjects alone that, under the pretext of searching for these, thousands of American citizens, under the safeguard of public law and of their national flag, have been torn from their country and from everything dear to them; have been dragged on board ships of war of a foreign nation and exposed, under the severities of their discipline, to be exiled to the most distant and deadly climes, to risk their lives in the battles of their oppressors, and to be the melancholy instruments of taking away those of their own brethren.

Against this crying enormity, which Great Britain would be so prompt to avenge if committed against herself, the United States have in vain exhausted remonstrances and expostulations, and that no proof might be wanting of their conciliatory dispositions, and no pretext left for a continuance of the practice, the British Government was formally assured of the readiness of the United States to enter into arrangements such as could not be rejected if the recovery of British subjects were the real and the sole object. The communication passed without effect.

British cruisers have been in the practice also of violating the rights and the peace of our coasts. They hover over and harass our entering and departing commerce. To the most insulting pretensions they have added the most lawless proceedings in our very harbors, and have wantonly spilt American blood within the sanctuary of our territorial jurisdiction. The principles and rules enforced by that nation, when a neutral nation, against armed vessels of belligerents hovering near her coasts and disturbing her commerce are well known. When called on, nevertheless, by the United States to punish the greater offenses committed by her own vessels, her Government has bestowed on their commanders additional marks of honor and confidence.

Under pretended blockades, without the presence of an adequate force and sometimes without the practicability of applying one, our commerce has been plundered in every sea, the great staples of our country have been cut off from their legitimate markets, and a destructive blow aimed at our agricultural and maritime interests. In aggravation of these predatory measures they have been considered as in force from the dates of their notification, a retrospective effect being thus added, as has been done in other important cases, to the unlawfulness of the course pursued. And to render the outrage the more signal these mock blockades have been reiterated and enforced in the face of official communications from the British Government declaring as the true definition of a legal blockade "that particular ports must be actually invested and previous warning given to vessels bound to them not to enter."

Not content with these occasional expedients for laying waste our neutral trade, the cabinet of Britain resorted at length to the sweeping system of blockades, under the name of orders in council, which has been molded and managed as might best suit its political views, its commercial jealousies, or the avidity of British cruisers.

To our remonstrances against the complicated and transcendent injustice of this innovation the first reply was that the orders were reluctantly adopted by Great Britain as a necessary retaliation on decrees of her enemy proclaiming a general blockade of the British Isles at a time when the naval force of that enemy dared not issue from his own ports. She was reminded without effect that her own prior blockades, unsupported by an adequate naval force actually applied and continued, were a bar to this plea; that executed edicts against millions of our property could not be retaliation on edicts confessedly impossible to be

executed; that retaliation, to be just, should fall on the party setting the guilty example, not on an innocent party which was not even chargeable with an acquiescence in it.

When deprived of this flimsy veil for a prohibition of our trade with her enemy by the repeal of his prohibition of our trade with Great Britain, her cabinet, instead of a corresponding repeal or a practical discontinuance of its orders, formally avowed a determination to persist in them against the United States until the markets of her enemy should be laid open to British products, thus asserting an obligation on a neutral power to require one belligerent to encourage by its internal regulations the trade of another belligerent, contradicting her own practice toward all nations, in peace as well as in war, and betraying the insincerity of those professions which inculcated a belief that, having resorted to her orders with regret, she was anxious to find an occasion for putting an end to them.

Abandoning still more all respect for the neutral rights of the United States and for its own consistency, the British Government now demands as prerequisites to a repeal of its orders as they relate to the United States that a formality should be observed in the repeal of the French decrees nowise necessary to their termination nor exemplified by British usage, and that the French repeal, besides including that portion of the decrees which operates within a territorial jurisdiction, as well as that which operates on the high seas, against the commerce of the United States should not be a single and special repeal in relation to the United States, but should be extended to whatever other neutral nations unconnected with them may be affected by those decrees. And as an additional insult, they are called on for a formal disavowal of conditions and pretensions advanced by the French Government for which the United States are so far from having made themselves responsible that, in official explanations which have been published to the world, and in a correspondence of the American minister at London with the British minister for foreign affairs such a responsibility was explicitly and emphatically disclaimed.

It has become, indeed, sufficiently certain that the commerce of the United States is to be sacrificed, not as interfering with the belligerent rights of Great Britain; not as supplying the wants of her enemies, which she herself supplies; but as interfering with the monopoly which she covets for her own commerce and navigation. She carries on a war against the lawful commerce of a friend that she may the better carry on a commerce with an enemy ? a commerce polluted by the forgeries and perjuries which are for the most part the only passports by which it can succeed.

Anxious to make every experiment short of the last resort of injured nations, the United States have withheld from Great Britain, under successive modifications, the benefits of a free intercourse with their market, the loss of which could not but outweigh the profits accruing from her restrictions of our commerce with other nations. And to entitle these experiments to the more favorable consideration they were so framed as to enable her to place her adversary under the exclusive operation of them. To these appeals her Government has been equally inflexible, as if willing to make sacrifices of every sort rather than yield to the claims of justice or renounce the errors of a false pride. Nay, so far were the attempts carried to overcome the attachment of the British cabinet to its unjust edicts that it received every encouragement within the competency of the executive branch of our Government to expect that a repeal of them would be followed by a war between the United States and France, unless the French edicts should also be repealed. Even this communication, although silencing forever the plea of a disposition in the United States to acquiesce in those edicts originally the sole plea for them, received no attention.

If no other proof existed of a predetermination of the British Government against a repeal of its orders, it might be found in the correspondence of the minister plenipotentiary of the United States at London and the British secretary for foreign affairs in 1810, on the question whether the blockade of May, 1806, was considered as in force or as not in force. It had been ascertained that the French Government, which urged this blockade as the ground of its Berlin decree, was willing in the event of its removal, to repeal that decree, which, being followed by alternate repeals of the other offensive edicts, might abolish the whole system on both sides. This inviting opportunity for accomplishing an object so important to the United States, and professed so often to be the desire of both the belligerents, was made known to the British Government. As that Government admits that an actual application of an adequate force is necessary to the existence of a legal blockade, and it was notorious that if such a force had ever been applied its long discontinuance had annulled the blockade in question, there could be no sufficient objection on the part of Great Britain to a formal revocation of it, and no imaginable objection to a declaration of the fact that the blockade did not exist. The declaration would have been consistent with her avowed principles of blockade, and would have enabled the United States to demand from France the pledged repeal of her decrees, either with success, in which case the way would have been opened for a general repeal of the belligerent edicts, or without success, in which case the United States would have been justified in turning their measures exclusively against France. The British Government would, however, neither rescind the blockade nor declare its nonexistence, nor permit its non-existence to be inferred and affirmed by the American plenipotentiary. On the contrary, by representing the blockade to be comprehended in the orders in council, the United States were compelled so to regard it in their subsequent proceedings.

There was a period when a favorable change in the policy of the British cabinet was justly considered as established. The minister plenipotentiary of His Britannic Majesty here proposed an adjustment of the differences more immediately endangering the harmony of the two countries. The proposition was accepted with the promptitude and cordiality corresponding with the invariable professions of this Government. A foundation appeared to be laid for a sincere and lasting reconciliation. The prospect, however, quickly vanished. The whole proceeding was disavowed by the British Government without any explanations which could at that time repress the belief that the disavowal proceeded from a spirit of hostility to the commercial rights and prosperity of the United States; and it has since come into proof that at the very moment when the public minister was holding the language of friendship and inspiring confidence in the sincerity of the negotiation with which he was charged a secret agent of his Government was employed in intrigues having for their object a subversion of our Government and a dismemberment of our happy union.

In reviewing the conduct of Great Britain toward the United States our attention is necessarily drawn to the warfare just renewed by the savages on one of our extensive frontiers ? a warfare which is known to spare neither age nor sex and to be distinguished by features peculiarly shocking to humanity. It is difficult to account for the activity and combinations which have for some time been developing themselves among tribes in constant intercourse with British traders and garrisons without connecting their hostility with that influence and without recollecting the authenticated examples of such interpositions heretofore furnished by the officers and agents of that Government.

Such is the spectacle of injuries and indignities which have been heaped on our country, and such the crisis which its unexampled forbearance and conciliatory efforts have not been able to avert. It might at least have been expected that an enlightened nation, if less urged by moral obligations or invited by friendly dispositions on the part of the United States, would have found its true interest alone a sufficient motive to respect their rights and their tranquillity on the high seas; that an enlarged policy would have favored that free and general circulation of commerce in which the British nation is at all times interested, and which in times of war is the best alleviation of its calamities to herself as well as to other belligerents; and more especially that the British cabinet would not, for the sake of a precarious and surreptitious intercourse with hostile markets, have persevered in a course of measures which necessarily put at hazard the invaluable market of a great and growing country, disposed to cultivate the mutual advantages of an active commerce.

Other counsels have prevailed. Our moderation and conciliation have had no other effect than to encourage perseverance and to enlarge pretensions. We behold our seafaring citizens still the daily victims of lawless violence, committed on the great common and highway of nations, even within sight of the country which owes them protection. We behold our vessels, freighted with the products of our soil and industry, or returning with the honest proceeds of them, wrested from their lawful destinations, confiscated by prize courts no longer the organs of public law but the instruments of arbitrary edicts, and their unfortunate crews dispersed and lost, or forced or inveigled in British ports into British fleets, whilst arguments are employed in support of these aggressions which have no foundation but in a principle equally supporting a claim to regulate our external commerce in all cases whatsoever.

We behold, in fine, on the side of Great Britain, a state of war against the United States, and on the side of the United States a state of peace toward Great Britain.

Whether the United States shall continue passive under these progressive usurpations and these accumulating wrongs, or, opposing force to force in defense of their national rights, shall commit a just cause into the hands of the Almighty Disposer of Events, avoiding all connections which might entangle it in the contest or views of other powers, and preserving a constant readiness to concur in an honorable re-establishment of peace and friendship, is a solemn question which the Constitution wisely confides to the legislative department of the Government. In recommending it to their early deliberations I am happy in the assurance that the decision will be worthy the enlightened and patriotic councils of a virtuous, a free, and a powerful nation.

Having presented this view of the relations of the United States with Great Britain and of the solemn alternative grow mg out of them, I proceed to remark that the communica tions last made to Congress on the subject of our relations with France will have shewn that since the revocation of her decrees, as they violated the neutral rights of the United States, her Government has authorized illegal captures by its privateers and public ships, and that other outrages have been practised on our vessels and our citizens It will have been seen also that no indemnity had been provided or satisfacto rily pledged for the extensive spoliations committed under the violent and retrospective orders of the French Government against the property of our citizens seized within the jurisdic tion of France I abstain at this time from recommending to the consideration of Congress definitive measures with re spect to that nation, in the expectation that the result of un closed discussions between our minister plenipotentiary at Paris and the French Government will speedily enable Congress to decide with greater advantage on the course due to the rights, the interests, and the honor of our country.

FEDERALIST 42 (U.S. Bicent), 1788 WL 456

The Powers Conferred by the Constitution Further Considered

From the New York Packet.
Tuesday, January 22, 1788.

MADISON

***1** *To the People of the State of New York:*

THE SECOND class of powers, lodged in the general government, consists of those which regulate the intercourse with foreign nations, to wit: to make treaties; to send and receive ambassadors, other public ministers, and consuls; to define and punish piracies and felonies committed on the high seas, and offenses against the law of nations; to regulate foreign commerce, including a power to prohibit, after the year 1808, the importation of slaves, and to lay an intermediate duty of ten dollars per head, as a discouragement to such importations.

This class of powers forms an obvious and essential branch of the federal administration. If we are to be one nation in any respect, it clearly ought to be in respect to other nations.

The powers to make treaties and to send and receive ambassadors, speak their own propriety. Both of them are comprised in the articles of Confederation, with this difference only, that the former is disembarrassed, by the plan of the convention, of an exception, under which treaties might be substantially frustrated by regulations of the States; and that a power of appointing and receiving "other public ministers and consuls," is expressly and very properly added to the former provision concerning ambassadors. The term ambassador, if taken strictly, as seems to be required by the second of the articles of Confederation, comprehends the highest grade only of public ministers, and excludes the grades which the United States will be most likely to prefer, where foreign embassies may be necessary. And under no latitude of construction will the term comprehend consuls. Yet it has been found expedient, and has been the practice of Congress, to employ the inferior grades of public ministers, and to send and receive consuls.

It is true, that where treaties of commerce stipulate for the mutual appointment of consuls, whose functions are connected with commerce, the admission of foreign consuls may fall within the power of making commercial treaties; and that where no such treaties exist, the mission of American consuls into foreign countries may PERHAPS be covered under the authority, given by the ninth article of the Confederation, to appoint all such civil officers as may be necessary for managing the general affairs of the United States. But the admission of consuls into the United States, where no previous treaty has stipulated it, seems to have been nowhere provided for. A supply of the omission is one of the lesser instances in which the convention have improved on the model before them. But the most minute provisions become important when they tend to obviate the necessity or the pretext for gradual and unobserved usurpations of power. A list of the cases in which Congress have been betrayed, or forced by the defects of the Confederation, into violations of their chartered authorities, would not a little surprise those who have paid no attention to the subject; and would be no inconsiderable argument in favor of the new Constitution, which seems to have provided no less studiously for the lesser, than the more obvious and striking defects of the old.

***2** The power to define and punish piracies and felonies committed on the high seas, and offenses against the law of nations, belongs with equal propriety to the general government, and is a still greater improvement on the articles of Confederation. These articles contain no provision for the case of offenses against the law of nations; and consequently leave it in the power of any indiscreet member to embroil the Confederacy with foreign nations. The provision of the federal articles on the subject of piracies and felonies extends no further than to the establishment of courts for the trial of these offenses. The definition of piracies might, perhaps, without inconveniency, be left to the law of nations; though a legislative definition of them is found in most municipal codes. A definition of felonies on the high seas is evidently requisite. Felony is a term of loose signification, even in the common law of England; and of various import in the statute law of that kingdom. But neither the common nor the

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

statute law of that, or of any other nation, ought to be a standard for the proceedings of this, unless previously made its own by legislative adoption. The meaning of the term, as defined in the codes of the several States, would be as impracticable as the former would be a dishonorable and illegitimate guide. It is not precisely the same in any two of the States; and varies in each with every revision of its criminal laws. For the sake of certainty and uniformity, therefore, the power of defining felonies in this case was in every respect necessary and proper.

The regulation of foreign commerce, having fallen within several views which have been taken of this subject, has been too fully discussed to need additional proofs here of its being properly submitted to the federal administration.

It were doubtless to be wished, that the power of prohibiting the importation of slaves had not been postponed until the year 1808, or rather that it had been suffered to have immediate operation. But it is not difficult to account, either for this restriction on the general government, or for the manner in which the whole clause is expressed. It ought to be considered as a great point gained in favor of humanity, that a period of twenty years may terminate forever, within these States, a traffic which has so long and so loudly upbraided the barbarism of modern policy; that within that period, it will receive a considerable discouragement from the federal government, and may be totally abolished, by a concurrence of the few States which continue the unnatural traffic, in the prohibitory example which has been given by so great a majority of the Union. Happy would it be for the unfortunate Africans, if an equal prospect lay before them of being redeemed from the oppressions of their European brethren!

Attempts have been made to pervert this clause into an objection against the Constitution, by representing it on one side as a criminal toleration of an illicit practice, and on another as calculated to prevent voluntary and beneficial emigrations from Europe to America. I mention these misconstructions, not with a view to give them an answer, for they deserve none, but as specimens of the manner and spirit in which some have thought fit to conduct their opposition to the proposed government.

***3** The powers included in the THIRD class are those which provide for the harmony and proper intercourse among the States.

Under this head might be included the particular restraints imposed on the authority of the States, and certain powers of the judicial department; but the former are reserved for a distinct class, and the latter will be particularly examined when we arrive at the structure and organization of the government. I shall confine myself to a cursory review of the remaining powers comprehended under this third description, to wit: to regulate commerce among the several States and the Indian tribes; to coin money, regulate the value thereof, and of foreign coin; to provide for the punishment of counterfeiting the current coin and secureties of the United States; to fix the standard of weights and measures; to establish a uniform rule of naturalization, and uniform laws of bankruptcy, to prescribe the manner in which the public acts, records, and judicial proceedings of each State shall be proved, and the effect they shall have in other States; and to establish post offices and post roads.

The defect of power in the existing Confederacy to regulate the commerce between its several members, is in the number of those which have been clearly pointed out by experience. To the proofs and remarks which former papers have brought into view on this subject, it may be added that without this supplemental provision, the great and essential power of regulating foreign commerce would have been incomplete and ineffectual. A very material object of this power was the relief of the States which import and export through other States, from the improper contributions levied on them by the latter. Were these at liberty to regulate the trade between State and State, it must be foreseen that ways would be found out to load the articles of import and export, during the passage through their jurisdiction, with duties which would fall on the makers of the latter and the consumers of the former. We may be assured by past experience, that such a practice would be introduced by future contrivances; and both by that and a common knowledge of human affairs, that it would nourish unceasing animosities, and not improbably terminate in serious interruptions of the public tranquillity. To those who do not view the question through the medium of passion or of interest, the desire of the commercial States to collect, in any form, an indirect revenue from their uncommercial neighbors, must appear not less impolitic than it is unfair; since it would stimulate the injured party, by resentment as well as interest, to resort to less convenient channels for their foreign trade. But the mild voice of reason, pleading the cause of an enlarged and permanent interest, is but too often drowned, before public bodies as well as individuals, by the clamors of an impatient avidity for immediate and immoderate gain.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

The necessity of a superintending authority over the reciprocal trade of confederated States, has been illustrated by other examples as well as our own. In Switzerland, where the Union is so very slight, each canton is obliged to allow to merchandises a passage through its jurisdiction into other cantons, without an augmentation of the tolls. In Germany it is a law of the empire, that the princes and states shall not lay tolls or customs on bridges, rivers, or passages, without the consent of the emperor and the diet; though it appears from a quotation in an antecedent paper, that the practice in this, as in many other instances in that confederacy, has not followed the law, and has produced there the mischiefs which have been foreseen here. Among the restraints imposed by the Union of the Netherlands on its members, one is, that they shall not establish imposts disadvantageous to their neighbors, without the general permission.

***4** The regulation of commerce with the Indian tribes is very properly unfettered from two limitations in the articles of Confederation, which render the provision obscure and contradictory. The power is there restrained to Indians, not members of any of the States, and is not to violate or infringe the legislative right of any State within its own limits. What description of Indians are to be deemed members of a State, is not yet settled, and has been a question of frequent perplexity and contention in the federal councils. And how the trade with Indians, though not members of a State, yet residing within its legislative jurisdiction, can be regulated by an external authority, without so far intruding on the internal rights of legislation, is absolutely incomprehensible. This is not the only case in which the articles of Confederation have inconsiderately endeavored to accomplish impossibilities; to reconcile a partial sovereignty in the Union, with complete sovereignty in the States; to subvert a mathematical axiom, by taking away a part, and letting the whole remain.

All that need be remarked on the power to coin money, regulate the value thereof, and of foreign coin, is, that by providing for this last case, the Constitution has supplied a material omission in the articles of Confederation. The authority of the existing Congress is restrained to the regulation of coin STRUCK by their own authority, or that of the respective States. It must be seen at once that the proposed uniformity in the VALUE of the current coin might be destroyed by subjecting that of foreign coin to the different regulations of the different States.

The punishment of counterfeiting the public securities, as well as the current coin, is submitted of course to that authority which is to secure the value of both.

The regulation of weights and measures is transferred from the articles of Confederation, and is founded on like considerations with the preceding power of regulating coin.

The dissimilarity in the rules of naturalization has long been remarked as a fault in our system, and as laying a foundation for intricate and delicate questions. In the fourth article of the Confederation, it is declared "that the FREE INHABITANTS of each of these States, paupers, vagabonds, and fugitives from justice, excepted, shall be entitled to all privileges and immunities of FREE CITIZENS in the several States; and THE PEOPLE of each State shall, in every other, enjoy all the privileges of trade and commerce," etc. There is a confusion of language here, which is remarkable. Why the terms FREE INHABITANTS are used in one part of the article, FREE CITIZENS in another, and PEOPLE in another; or what was meant by superadding to "all privileges and immunities of free citizens," "all the privileges of trade and commerce," cannot easily be determined. It seems to be a construction scarcely avoidable, however, that those who come under the denomination of FREE INHABITANTS of a State, although not citizens of such State, are entitled, in every other State, to all the privileges of FREE CITIZENS of the latter; that is, to greater privileges than they may be entitled to in their own State: so that it may be in the power of a particular State, or rather every State is laid under a necessity, not only to confer the rights of citizenship in other States upon any whom it may admit to such rights within itself, but upon any whom it may allow to become inhabitants within its jurisdiction. But were an exposition of the term "inhabitants" to be admitted which would confine the stipulated privileges to citizens alone, the difficulty is diminished only, not removed. The very improper power would still be retained by each State, of naturalizing aliens in every other State. In one State, residence for a short term confirms all the rights of citizenship: in another, qualifications of greater importance are required. An alien, therefore, legally incapacitated for certain rights in the latter, may, by previous residence only in the former, elude his incapacity; and thus the law of one State be preposterously rendered paramount to the law of

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

another, within the jurisdiction of the other. We owe it to mere casualty, that very serious embarrassments on this subject have been hitherto escaped. By the laws of several States, certain descriptions of aliens, who had rendered themselves obnoxious, were laid under interdicts inconsistent not only with the rights of citizenship but with the privilege of residence. What would have been the consequence, if such persons, by residence or otherwise, had acquired the character of citizens under the laws of another State, and then asserted their rights as such, both to residence and citizenship, within the State proscribing them? Whatever the legal consequences might have been, other consequences would probably have resulted, of too serious a nature not to be provided against. The new Constitution has accordingly, with great propriety, made provision against them, and all others proceeding from the defect of the Confederation on this head, by authorizing the general government to establish a uniform rule of naturalization throughout the United States.

***5** The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question.

The power of prescribing by general laws, the manner in which the public acts, records and judicial proceedings of each State shall be proved, and the effect they shall have in other States, is an evident and valuable improvement on the clause relating to this subject in the articles of Confederation. The meaning of the latter is extremely indeterminate, and can be of little importance under any interpretation which it will bear. The power here established may be rendered a very convenient instrument of justice, and be particularly beneficial on the borders of contiguous States, where the effects liable to justice may be suddenly and secretly translated, in any stage of the process, within a foreign jurisdiction.

The power of establishing post roads must, in every view, be a harmless power, and may, perhaps, by judicious management, become productive of great public conveniency. Nothing which tends to facilitate the intercourse between the States can be deemed unworthy of the public care.

PUBLIUS.

FEDERALIST 42 (U.S. Bicent), 1788 WL 456

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.